# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| TED D. KELLNER,<br><br>    Plaintiff and<br>    Counterclaim-Defendant,<br><br>v.<br><br>AIM IMMUNOTECH INC.,<br><br>    Defendant and<br>    Counterclaim-Plaintiff,<br><br>and<br><br>THOMAS EQUELS, WILLIAM MITCHELL, STEWART APPELROUTH, AND NANCY K. BRYAN,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2023-0879-LWW |

## OPINION

Date Submitted: December 5, 2023
Date Decided: December 28, 2023

John M. Seaman, Eric A. Veres & Eliezer Y. Feinstein, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Jeffrey J. Lyons & Michael E. Neminski, BAKER & HOSTETLER LLP, Wilmington, Delaware; Teresa Goody Guillén, BAKER & HOSTETLER LLP, Washington, D.C.; Marco Molina, BAKER & HOSTETLER LLP, Costa Mesa, California; Ambika B. Singhal, BAKER & HOSTETLER LLP, Dallas, Texas; Alexandra L. Trujillo, BAKER & HOSTETLER LLP, Houston, Texas; *Counsel for Ted D. Kellner*

William R. Denny, Matthew F. Davis, Nicholas D. Mozal & Caneel Radinson-Blasucci, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Stefan Atkinson, Mary T. Reale & Mason E. Reynolds, KIRKLAND & ELLIS LLP, New York, New York; Michael F. Williams & Don Hong, KIRKLAND & ELLIS LLP, Washington, D.C.; *Counsel for Thomas Equels, William Mitchell, Stewart Appelrouth, Nancy K. Bryan, and AIM ImmunoTech Inc.*

**WILL, Vice Chancellor**

This post-trial decision resolves an expedited action regarding the adoption and enforcement of advance notice bylaws. It harkens back to a related case heard last year and hints at what coming activism disputes may bring. One could say that my holiday season was visited by litigation past, present, and future.

In 2022, a group schemed to run a proxy contest against AIM Immunotech Inc. A dissident nomination was submitted after a potential director candidate asked his friend to purchase AIM shares and front the attempt. The stockholder's notice raised the board's suspicion that treachery was afoot since it appeared to be a continuation of a prior failed nomination—one orchestrated by a felon who had meddled with AIM's business. Because the notice neglected to mention any arrangement or understanding involving the broader group, as required by AIM's advance notice bylaws, it was rejected. The stockholder moved for a preliminary injunction in this court, but the mandatory relief he sought was unprocurable on a disputed factual record.

Now, a renewed nomination attempt is before me. It is, in many ways, smarter than the preceding effort. The nomination is being pressed by a sophisticated investor with a substantial number of AIM shares. Perhaps understanding the high bar to obtaining a mandatory injunction on a preliminary record, he has taken his claims through trial. Yet his notice suffers from the same primary defect as his

1

predecessor's: it obscures obvious arrangements or understandings pertaining to the nomination.

The plaintiff also lodged a facial challenge to a set of amended advance notice bylaws recently adopted amid dark skies, arguing that they threaten stockholders' ability to make future nominations. Several of the bylaws are so shrouded in layers of murky text that their limits are a mystery. Reviewed through the lens of enhanced scrutiny, they are disproportionate responses to any threatened corporate objectives.

Thus, the opinion that follows is a tale of wins and losses on both sides. As with the past effort, the present nomination notice contravened valid bylaws. The board's rejection of the notice withstands inquiry. Certain bylaws, however, must fall because they inequitably imperil the stockholder franchise to no legitimate end. Perhaps these lessons will be heeded in matters still to come.

## I.    BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]  The trial record includes the testimony of 10 fact and 2 expert witnesses, 22 deposition transcripts, and 1,241 joint exhibits.[2]

### A.    AIM ImmunoTech

AIM ImmunoTech Inc. ("AIM" or the "Company") is an immuno-pharma company incorporated in Delaware with its principal place of business in Ocala, Florida.[3]  Its stock is traded on the NYSE American exchange.[4]  AIM's stock price has decreased by 99% since 2016 and it has a single drug with the requisite regulatory approvals to be commercialized.[5]  The Company's lead product is an investigational drug called Ampligen, which is in clinical trials for immune system disorders, viral diseases, and cancers.[6]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 234) ("PTO").

[2] Facts drawn from exhibits jointly submitted by the parties are referred to by the numbers provided on the parties' joint exhibit list and cited as "JX __" unless otherwise defined. Dkt. 253.  Deposition transcripts are cited as "[Name] Dep."  *See* Dkts. 238-40, 252.  Trial testimony is cited as "[Name] Tr."  *See* Dkts. 264-66.

[3] PTO ¶ 10.

[4] *Id.*

[5] *See* JX 901 at 2; JX 701 at 8.

[6] PTO ¶ 10.

AIM's board of directors (the "Board") has four members: Thomas Equels, William Mitchell, Stewart Appelrouth, and Nancy K. Bryan.[7] Equels, a lawyer by training, is AIM's Chief Executive Officer and has served on the Board since 2008.[8] Mitchell, a physician, is a long-tenured Board member who serves as Chairman.[9] He holds a Ph.D. in biochemistry and has studied Ampligen since its early development in the mid-1980s.[10] Appelrouth, an accountant, joined the Board in 2016.[11] Bryan is the newest addition to the Board, having been appointed in March 2023.[12] She is the President of BioFlorida, Inc., of which AIM is a member.[13]

## B.    Tudor's Interest in AIM

AIM's stockholder base is primarily composed of retail investors. One, Franz Tudor, began to beset AIM management with frequent communications in the summer of 2020. On July 30, 2020, Tudor sent a Twitter direct message to AIM's public relations manager advising on how to "be taken seriously."[14] Tudor stated: "I

---

[7] *Id.*

[8] *Id.* ¶ 11; Equels Tr. 494. Equels began his tenure at the Company while it was called Hemispherx. PTO ¶ 10.

[9] PTO ¶ 12; Mitchell Tr. 630.

[10] Mitchell Tr. 630-32.

[11] PTO ¶ 13; Appelrouth Tr. 682.

[12] PTO ¶ 14.

[13] *Id.*

[14] JX 45.

now represent over 1 mil[lion] shares b[etween] the various funds [I] consult and my own ownership. Why do you think [the] stock didn't break 2.65 today? That was us buying every share sub 2.70."[15]

Around the same time, Tudor contacted Equels and asked to obtain a position as an international business development consultant for the Company.[16] Equels looked into Tudor's background and learned that in 2009, Tudor pleaded guilty to securities fraud and conspiracy to commit securities fraud as part of an insider trading scheme at Galleon Group.[17] Tudor is permanently enjoined from engaging in certain activities related to penny stocks—a class of microcaps that includes AIM.[18]

On August 4, Tudor emailed Equels to thank him for the "opportunity to assist AIM in its business development initiatives."[19] AIM "pass[ed]" on Tudor's proposal.[20] After losing touch with Equels, Tudor attempted to contact other Board members and the Company's investor relations representative.[21] In a September 25

---

[15] *Id.* at 2.

[16] Tudor Dep. 55-56; *see* JX 362 ("Equels Aff.") ¶ 6.

[17] PTO ¶ 17.

[18] Equels Aff. ¶ 5; *see also id.* Ex. A.

[19] JX 47. Tudor also asked Equels if Ampligen could be shipped to his spouse's family in Ecuador. JX 49 at 2.

[20] JX 49 at 1.

[21] JX 56; JX 79 at 161.

message to Appelrouth, Tudor said that he "represent[ed] some of AIM[']s largest shareholders" and would like to share "feedback as to how to improve operations and drive shareholder value."[22] He requested a "group conference call" with the Board.[23] Tudor's messages went unanswered.

Tudor then began representing to third parties—including principal investigators in Ampligen clinical trials and a U.S. Food and Drug Administration lobbyist—that he was associated with AIM.[24] On October 16, AIM's counsel asked Tudor to cease and desist representing that he was "authorized to speak on behalf of AIM."[25] The warning was ignored.[26]

In February 2021, AIM commenced litigation against Tudor in Florida state court to prevent him from interfering with AIM's business.[27] AIM subsequently obtained an injunction that permanently enjoined Tudor from contacting the Company's business relations.[28]

---

[22] JX 56 (Tudor noting that he had sent a similar message to Mitchell).

[23] *Id.* Tudor sent over 50 Twitter direct messages to AIM representatives between late July 2020 and early January 2021. JXs 75-76; *see also* JX 77 at 31.

[24] JXs 61-62; JX 66; JX 68; JX 74 at 113; *see also* Equels Aff. ¶ 9.

[25] JX 67.

[26] Equels Aff. ¶ 12.

[27] *Id.* ¶ 13.

[28] JX 92; JX 96.

6

## C. The Lautz Nomination

Tudor was not alone in his campaign to find influence with AIM. He was joined by his former colleague at Galleon Group, Todd Deutsch.[29] Deutsch beneficially owns 1,716,100 shares of AIM common stock—about 3.5% of the Company's outstanding shares.[30] He previously worked for a wealth management services company and spent 20 years as a trader with Goldman Sachs and various hedge funds.[31] Since leaving client services in 2012, Deutsch manages his own home office portfolio.[32]

Like Tudor, Deutsch began repeatedly contacting AIM in the summer of 2020, conveying his growing frustration with the Company's management and his significant losses.[33] Some of his communications were strikingly similar in style and tone to those Tudor sent at the same time—even after Tudor was enjoined from contacting AIM.[34] Other emails from Tudor were forwarded by Deutsch to Equels.[35]

---

[29] *See* Deutsch Tr. 161; Tudor Dep. 48-49.

[30] PTO ¶ 16.

[31] *Id.*

[32] *Id.*

[33] JXs 51-52; JX 90; JX 126; *see also* JX 78 at 2 ("Had your chance. . . . Idiots[.]").

[34] *Compare* JX 145, *with* JX 146.

[35] JXs 190-93.

7

In late 2021, Tudor told fellow AIM stockholder Walter Lautz that he had a plan to "oust[]" the Board.[36] By the spring, Tudor had identified two potential director nominees: Daniel Ring and Robert Chioini.[37] Tudor had known Chioini for years, having worked together at Rockwell Medical Technologies—a dialysis company Chioini co-founded.[38] Rockwell Medical and Chioini parted ways in 2018 after the company publicly announced that its board determined Chioini "lacked key attributes necessary to oversee the [company's] growth and long-term success."[39] Ring was another business acquaintance of Tudor.[40]

On April 18, Tudor texted Deutsch that "[m]y BMY guy [Ring] can be on the AIM [Board]."[41] Tudor noted: "We will need a shareholder to make the nomination and [I] will get everything together."[42] Tudor introduced Chioini to Lautz by email, forwarded Ring's resume to Lautz, and prepared materials for the nomination.[43] Later that day, Lautz submitted a notice to AIM purporting to nominate Ring and

---

[36] JX 125; *see* JX 124; JX 131; JX 280.

[37] JX 197; JX 203; JX 199; JX 418 at 13-14.

[38] PTO ¶ 15; Chioini Tr. 8; Equels Tr. 529.

[39] JX 28. Whether Chioini "left" Rockwell of his own accord or was fired became a matter of debate at trial. *See* Chioini Tr. 9, 128; JX 28.

[40] JX 418 at 31, 36.

[41] JX 197.

[42] *Id.*; *see* Deutsch Tr. 182-83.

[43] JXs 195-96; JX 198; JX 203.

Chioini to the Board.[44]  The nomination notice was drafted by Tudor and untouched by Lautz before its submission.[45]  The notice, however, made no mention of Tudor.[46]

### D.    Kellner's Growing Interest

Deutsch kept another major AIM stockholder, Ted D. Kellner, apprised of these efforts.  Kellner is a retired founder and portfolio manager of Fiduciary Management, Inc., a philanthropist, and a minority owner of the Milwaukee Bucks.[47] Kellner and Deutsch have known each other for over two decades.[48]  Kellner first purchased AIM stock in early 2021 at Deutsch's suggestion.[49]  Today, Kellner is the record holder of 1,000 shares of AIM common stock and beneficially owns a substantial stake.[50]

Around February 2021, Deutsch began sending Kellner information from Tudor about AIM's stock performance, mostly by forwarding Kellner emails written by Tudor.[51]  Kellner thought the Company had promise but was stunted by

---

[44] JX 200.

[45] *Id.*; JX 201; Tudor Dep. 62.

[46] *See* JX 200.

[47] Kellner Tr. 218-20; PTO ¶ 8.

[48] Kellner Tr. 220; Deutsch Tr. 146.

[49] Kellner Tr. 220-21; Deutsch Tr. 172.

[50] PTO ¶ 9.

[51] JXs 88-89; JX 91; JX 108.  Kellner received this information either directly from Deutsch or indirectly through his executive assistant.  *Compare* JX 116, *with* JX 118.

mismanagement.[52]  Like Deutsch, Kellner lost most of the value of his AIM investment.[53]  By the fall of 2021, Kellner became more involved in Tudor and Deutsch's correspondence with the Company.[54]

On April 19—one day after Lautz submitted his attempted nomination notice—Deutsch sent Kellner an investment analysis about AIM that Tudor had prepared.[55]  Kellner printed out the email and marked it up by hand.[56]  At the top of the page, Kellner wrote: "48 million shares.  What do we own?  15 to 18%[?]"[57]  The "we" referred to Kellner, Tudor, and Deutsch.[58]

---

[52] JX 93; JX 111; Kellner Tr. 220, 222-23.

[53] Kellner Tr. 222.

[54] *E.g.*, JX 116 at 1 (Kellner to Deutsch: "Have you and Franz drafted the letter we were intending to send to the AIM management team?"); JX 122 (Deutsch to Kellner: "[W]e need you[r] help[.]  I have CEO and board members['] emails.").

[55] JX 205.

[56] *Id.*

[57] *Id.* at 1.

[58] Kellner Tr. 253-54 ("I knew that I had a 3 percent stake, roughly.  I knew that Todd had a little bit more.  It was my belief that, as was conveyed over some time, that Franz Tudor had a stake of a like amount. . . . I thought if there was one or two other shareholders, that there could be another 2 or 3 percent[] owners in the company."); *id.* at 291, 323-24.

10

## E.  Preparations for a Proxy Fight

On April 28, AIM rejected Lautz's purported notice for non-compliance with federal securities laws.[59]  It became apparent that a better prepared, advised, and funded effort would be needed.

Chioini sought financial support from his fellow co-founder of Rockwell Medical, Michael Xirinachs.[60]  Xirinachs is a trader who pleaded guilty in 2022 to criminal charges involving fraudulent securities trading, promotion and material misrepresentations to investors, and misuse of funds.[61]  On April 29, Chioini sent Xirinachs a copy of AIM's bylaws and flagged the advance notice provisions.[62]  On May 1, Chioini emailed Xirinachs to set up a call with Tudor regarding the "AIM deal."[63]

By May 2, Tudor had contacted counsel from Baker & Hostetler LLP ("BakerHostetler") to advise on a potential proxy contest.[64]  On May 3, Xirinachs, Tudor, and Chioini received a calendar invite from an attorney at BakerHostetler

---

[59] JX 235.

[60] Chioini Tr. 77 ("[W]ith Mr. Xirinachs, I wanted him to be part of the group to help finance the proxy contest.").

[61] JX 397 at 25.  Xirinachs was also found to have committed wire fraud, with the Securities and Exchange Commission (SEC) obtaining a judgment against him and his company.  JX 16 at 6-9.

[62] JX 238.

[63] JX 239.

[64] JX 179.

with the subject "Potential Engagement: Proxy Contest."[65]  A few hours after the scheduled call, Tudor sent a text message to Lautz stating: "Fyi haven[']t given up. Been doing lawyer calls to work out a strategy."[66]

On May 4, Deutsch forwarded Kellner an email that Tudor had sent to AIM's investor relations representative with the subject "AIM Needs the Right and Good People."[67]  In handwritten notes on a printout of the email, Kellner highlighted the directors' salaries and wrote "poor mgt!" and "[r]eplace mgt?"[68]  His notes-to-self exclaimed: "Why are we picking this fight!"[69]  After AIM's investor relations team ignored Tudor's May 4 correspondence, Tudor sent another email stating: "By totally ignoring me and not acting professionally you now get gloves off. . . . This is just [d]isgusting."[70]

### F.  Kellner's Surprise and Lautz's Lament

Tudor continued to express his frustration to Equels in early June.[71]  After Deutsch forwarded one of Tudor's emails to Kellner on June 2, Kellner

---

[65] JX 244.  Chioini does not "recall canceling the meeting."  Chioini Tr. 73.

[66] JX 245.  Although the recipient's identity is not obvious from the face of the document, it appears to be Lautz.

[67] JX 247.

[68] JX 248.

[69] *Id.*  During his testimony, Kellner did not recall who the "we" mentioned in his notes referred to.  Kellner Tr. 299.

[70] JX 255.

[71] *See* JX 265 at 2.

12

responded: "Ridiculous!! Did they have an annual meeting yet Todd?"[72]  Deutsch

then forwarded another email to Kellner from Tudor that said:

> If you would like to send to Ted. [sic]
>
> Their annual shareholder meeting for the past 2 years has been on Oct[ober] 7th. . . . There is a window of June 6 to July 7 to run a proxy battle and nominate BOD members. . . .
>
> I have 2 strong candidates to run and get control of the [Board].  I have spoken with legal counsel and it would cost an estimated $100k in legal fees and $50k for the proxy solicitor.  If the proxy battle is won then the Company would reimburse the proxy battle expenses.  I have a shareholder who is will[ing] to have their name as the lead but so far have not been able to find anyone to front the $150k.[73]

Kellner printed the email, highlighted it, and made handwritten notes to himself.[74]

Kellner subsequently learned that Tudor owned drastically fewer shares than Kellner had believed.[75]  On June 4, Kellner texted Deutsch to say: "In my discussions with Franz . . .  I was frankly stunned to learn he only owned 45,000 shares of the stock.  Not a strong [text cuts off]."[76]  Deutsch responded: "It[']s a huge part of his net worth [since] he had two unfort[unate] events th[a]t almost bankrupt[ed] him . . . I promise [you] he is as smart [as] they come in [the] space . . . So we are

---

[72] *Id.* at 1.

[73] *Id.*

[74] *Id.*

[75] Kellner Tr. 253-54.

[76] JX 433 at 1.

aligned."[77]  Deutsch went on to say that Tudor was "all in on this" and "d[idn't] want to let [Kellner] and [Deutsch] down."[78]  Kellner responded that Tudor "doesn't need to worry nor you about Teddy!!![13 emojis, including thumbs up and smiley faces]."[79]

Although Tudor hoped that Lautz would be the stockholder submitting the nomination, Lautz declined.  On June 14, Lautz wrote Tudor an email with the subject line "FYI – Potential Dirt on Me."[80]  Lautz told Tudor that he "just came to think" about the fact that he had been "fired from Merrill for 'selling away.'"[81]  Lautz noted that he had been the subject of "a FINRA investigation" and "was terminated from one of the largest brokerage houses on the planet," which "may not be a good look" for the nomination effort.[82]  Tudor sent Lautz's email to Chioini, who copied Xirinachs on a response offering to "have the attorney look at it."[83]

Chioini and Xirinachs kept in regular contact with one another and with counsel at BakerHostetler throughout the summer of 2022.  The two circulated

---

[77] *Id.*

[78] *Id.* at 2.

[79] *Id.*

[80] JX 274 at 1.

[81] *Id.*

[82] *Id.*

[83] *Id.*

multiple iterations of a draft nomination notice (before a stockholder to submit it had been found).[84]  They are jointly responsible for the legal fees associated with the eventual 2022 nomination and related litigation in this court.[85]

### G.    More Surprise for Kellner

In mid-June, AIM's outside counsel sent correspondence to Deutsch, Kellner, and Tudor's counsel demanding that they comply with the requirements of Section 13(d) of the Securities and Exchange Act of 1934.[86]  AIM became concerned after Deutsch attempted to have Tudor attend "as an undisclosed party, a telephone conference between AIM's [investor relations] firm," Deutsch, and Kellner.[87]  The correspondence mentioned Deutsch's hostility towards AIM's management, that Tudor was convicted of insider trading, and that AIM had obtained a permanent injunction against Tudor.[88]

These revelations about Tudor surprised Kellner.[89]  In handwritten notes on a copy of the letter, Kellner wrote "FRANZ TUDOR – IS A FELON?" and "INSIDER

---

[84] JX 392; JX 401; JX 416; JX 454; JX 990; JX 1000; JX 1020; *see* Harrington Tr. 426-27. A number of these documents were withheld as attorney-client privileged under a common interest.  *See* JX 392.

[85] Chioini Tr. 111.

[86] JX 277 at 4-5; JX 292 ("Mr. Tudor has surreptitiously engaged himself in a stockholder group consisting of, at a minimum, Mr. Deutsch and Mr. Kellner.").

[87] JX 292; JX 277 Ex. A.

[88] JX 277 at 5.

[89] Kellner Tr. 258-59.

TRADING?"[90]  Kellner also wrote the names "Robb [sic] Chioini" and "Michael Zeaniack [Xirinachs]," noting: "our plans – get a lawyer."[91]

### H.    The Jorgl Nomination

In late June, the nomination effort needed both a stockholder nominator and a nominee since Ring dropped out.  On June 21, Lautz texted Tudor and asked, "were you able to find someone to be the face of the activist?"[92]  Tudor responded: "We are still looking."[93]

The next day, Chioini recruited Michael Rice to be his co-nominee.[94]  Rice is a co-founder of Life Sci Advisers, which served as Rockwell Medical's investor relations consultant during Chioini's tenure.[95]  Like Chioini, Rice is not an AIM stockholder.[96]  Chioini sent Rice's contact information to Tudor, and Tudor sent Rice a description of AIM.[97]

---

[90] JX 278 at 1.

[91] *Id.*

[92] JX 280.

[93] *Id.*

[94] Chioini Tr. 78.

[95] JX 404 at 44.

[96] JX 393 at 52.

[97] JX 284; JX 283.

16

Rice was able to supply the "body" (to use Chioini's word) to make the nomination.[98]  At Rice's request, Jonathan Jorgl—a friend that Rice surfed with—bought 1,000 shares of AIM stock on June 27.[99]  Jorgl had never heard of AIM beforehand, but was willing to join the cause so long as he was not responsible for attorneys' fees.[100]  With help from Rice and Xirinachs, Jorgl put the shares into his name of record just before the nomination deadline.[101]  On July 8, Jorgl submitted his nomination notice with Chioini and Rice as his proposed nominees.[102]

The next day, Kellner had a call with Tudor to discuss the nomination.[103]  During the call, Kellner took contemporaneous handwritten notes.  He wrote: "Annual meeting is October 7th[.]  Franz submitted 2 new directors on Friday July 8th: 1. Mike Rice[;] 2. Rob Chioini."[104]

---

[98] JX 291 at 2 (Chioini to Rice: "We really need to get your body to by [sic] the shares today every day matters."); JX 295.

[99] Jorgl Dep. 17, 32-33; *see Jorgl v. AIM Immunotech Inc.*, 2022 WL 16543834, at *1 (Del. Ch. Oct. 28, 2022).

[100] *See* JX 321; Jorgl Dep. 63 (noting that he was unwilling to take on legal fees).

[101] *See* JX 288; JX 290; JX 294; JX 321.

[102] JX 322.

[103] *See* JX 325.

[104] *Id.* at 1.  Kellner testified that he was mistaken in noting that Tudor submitted the nomination and meant to write Jorgl.  But since Jorgl did not enter the picture until late June and Kellner was in regular contact with Tudor, it makes more sense that Kellner's notes reflect his belief that Tudor was driving the effort.  *See* Kellner Tr. 239-40 ("Q: Why did you identify the stockholder as Mr. Franz Tudor if, as you just testified, that is not correct?  Kellner: Well, I can only describe—the Jorgl name had only become known to me, I think, a month before, and when the Jorgl suit here—I've never, to this day, talked

17

On July 19, AIM rejected Jorgl's nomination notice.[105]  AIM General Counsel Peter Rodino wrote that Jorgl's notice "fail[ed] to satisfy Section 1.4 of [AIM's] [b]ylaws and applicable law by, among other things, making false and misleading statements in lieu of providing [the required] information."[106]  Section 1.4(c) of AIM's bylaws, as adopted in 2016 (the "2016 Bylaws"), required a stockholder proposal to disclose "arrangements or understandings . . . pursuant to which the nomination(s) are to be made."[107]  Because the deadline for providing notice of nominations for the 2022 annual meeting had passed, Jorgl was unable to amend his notice or submit a new one.[108]

On July 29, Jorgl filed a Verified Complaint in this court seeking a declaration that the Board had violated AIM's advance notice bylaw by refusing to accept his notice.[109]  On August 1, he filed a motion for a preliminary injunction to cause the

---

with Mr. Jorgl.  I didn't remember.").  Kellner's testimony that he meant "Jorgl" instead of "Franz" is also belied by his August 2022 description of the prospective proxy contest.  *See infra* note 143 and accompanying text; *see also* JX 522.

[105] JX 344.

[106] *Id.*

[107] JX 23 ("2016 Bylaws") § 1.4(c).

[108] JX 344.

[109] *Jorgl*, 2022 WL 16543834, at *9.

Board to place his nominees on AIM's universal proxy card.[110] Expedited discovery ensued.

Litigation was simultaneously unfolding in Florida, where AIM sued Tudor, Deutsch, Kellner, Jorgl, Lautz, Chioini, and Rice.[111] AIM alleged that the defendants violated Section 13(d) of the Exchange Act and sought a permanent injunction to prevent them from "committing any further violations of federal securities laws."[112] AIM later amended its complaint to remove Chioini and Rice as parties.[113]

## I. The 2022 Annual Meeting

On August 23, 2022, while litigation in Delaware and Florida was ongoing, Kellner drafted an update to The Beta Fund Investment Club.[114] The club members are Kellner's fraternity brothers for whom he manages an investment portfolio.[115] The fund's portfolio includes AIM stock. Preparing to update the "Beta Funders," Kellner wrote:

> In Aim's case, there is now a legal suit, which I am a part of, to replace management. . . . My view, along with two others joining me in the proxy battle, is that management has done an abominable job. . . . A couple of weeks ago, Todd Deutsch, who is known to several of you,

---

[110] *Id.*

[111] JX 1117 at 1.

[112] *Id.* ¶¶ 48-50, 53.

[113] *See* JX 497 at 1. Chioini and Rice were dropped from the lawsuit because the two "claimed to not be stockholders" of AIM. Equels Tr. 611-12.

[114] JX 522; *see* Kellner Tr. 331-32.

[115] *See* JX 951 at 5.

19

and a gentleman named Franz Tudor, commenced a proxy to replace all of the directors and ultimately management [of AIM]. ***I am now a party to that proxy fight***, which will hopefully commence with the replacement of the management team in the next twelve months. More on that as time progresses.[116]

Meanwhile, Kellner was preparing for the 2022 annual meeting. On October 27, Kellner's assistant told Tudor that "[Kellner] asked [her] to coordinate a breakfast" before the meeting and "would like for Thomas [sic] Jorgl, Robert Chioini, and Michael Rice to also come."[117] Jorgl's preliminary injunction motion was denied the next day.[118]

Though the breakfast did not go forward, Kellner attended AIM's annual meeting in person. He found the experience disappointing and felt that his questions were brushed off.[119] All three company director nominees were reelected.[120] While driving home from the meeting, Kellner "became increasingly frustrated and angry o[ver] what had transpired."[121]

---

[116] JX 522 at 3 (emphasis added). Kellner testified that the "proxy fight" referenced him voting his shares for the "gold card slate" at the annual meeting. Kellner Tr. 249. That testimony is inconsistent with the record, as no gold card existed until September 15 when Jorgl filed his preliminary proxy statement. JX 397. Kellner could not have voted the gold card until after Jorgl filed his definitive proxy statement. *See* Kellner Tr. 340.

[117] JX 451; *see* Kellner Tr. 342.

[118] *Jorgl*, 2022 WL 16543834, at *17.

[119] JX 467 ("At the outset they excused me from the meeting to see if I could be included given the fact that I did not vote the white proxy."); Kellner Tr. 225-26.

[120] JX 473; JX 474 at 1; JX 475 at 1-2.

[121] Kellner Tr. 226.

20

That evening, Kellner reached out to Deutsch and Tudor via text message to "get a sense as to what Jorgl and his team [wa]s up to" and discuss "next steps."[122] Kellner was "hoping this thing w[ould] still move forward and Jorgl [wa]s fully committed."[123] Kellner remarked that he and Deutsch were "the only two guys wi[th] skin in the game" and that they were "underwater by several million dollars."[124] He asked to convene a call with "the Jorgl team and the three of us [Kellner, Tudor, and Deutsch] to ascertain what the next steps are."[125]

Chioini, for his part, remained committed to getting on AIM's Board. On November 3, Chioini told the group's proxy solicitor: "We do intend to contest next year and will submit our nomination well in advance of the deadline to avert any antics like this year."[126] Chioini copied Rice on the message and forwarded it to Xirinachs.[127]

## J.    Preparations for 2023

On November 9, the Board publicly announced that it had "initiated a process to add two directors who bring diversity and additional biotechnology

---

[122] JX 467.

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] JX 468 at 1; *see* Chioini Tr. 97-100. When questioned about who "we" referred to, Chioini testified "[t]he 'we' is me." Chioini Tr. 18.

[127] JX 468 at 1.

commercialization experience."[128]  The announcement stated that the Board would also engage an independent consultant to evaluate the compensation structure of AIM's executives.[129]  Mitchell noted that the Board was "taking these important steps in response to the feedback [the Board] received from shareholders in connection with the recent 2022 Annual Meeting."[130]

Chioini interpreted the press release as a "an opportunity to open dialogue with AIM and the board."[131]  He directed John Harrington, his counsel from BakerHostetler, to relay to AIM his and Rice's continued interest in being directors.[132]  Harrington shared these sentiments in a November 13 email to the Board sent "on behalf of [his] clients" Chioini and Rice.[133]  Harrington stated: "[W]e recommend that you appoint Mr. Chioini and Mr. Rice to the Board and appropriate committees promptly.  As you know, your stockholders have already expressed very strong support for the election of both of them."[134]

---

[128] JX 487 at 1.

[129] *Id.*

[130] *Id.*

[131] Chioini Tr. 19-20.

[132] *Id.* at 20-21.

[133] JX 499 at 3.  Oddly, Harrington did not represent an AIM stockholder in making this request.  He was acting on behalf of two individuals who felt that they were entitled to a Board seat because they viewed votes cast in the prior proxy contest as favorable to them.

[134] *Id.*

Chioini instructed Harrington to follow up, and on December 5, Harrington called AIM's Delaware counsel, Michael Pittenger of Potter Anderson & Corroon LLP.[135] Harrington told Pittenger that Chioini and Rice wanted to "avoid another proxy contest" and would be amenable to "mutually agreeable directors" joining the Board.[136] Harrington stressed that Chioini and Rice grew "impatient" and would be "ready to come out guns blazing" and "better organized next year."[137] Afterward, Harrington emailed Chioini a recap of the call. Harrington relayed that Pittenger "would be surprised if the AIM board appointed [Chioini] or Mike Rice based [on] everything that ha[d] happened."[138]

Some days later, Chioini and Kellner spoke for the first time. In a December 14 text message to Harrington, Chioini recounted that he "spoke with Kellner last week."[139] Chioini told Harrington that Kellner was "very interested in working with [them] to remove these guys" and "want[ed] to keep in touch."[140]

---

[135] *See* JX 825 at 5.

[136] Pittenger Tr. 709-11; *see* Harrington Tr. 392.

[137] JX 825; JX 526; Pittenger Tr. 709-11; Harrington Tr. 393-94.

[138] JX 525 at 1.

[139] JX 541.

[140] *Id.*; *see* Kellner Tr. 349 (testifying that he recalls the call with Chioini happened but not what was discussed).

23

The following week, Kellner sent a final update letter to the Beta Fund Investment Club.[141] Regarding AIM, he wrote: "Two other investors are joining me in a proxy battle to replace an inept management team. More on that as time progresses."[142] It is more likely than not that the referenced "two other investors" were Deutsch and Tudor.[143]

In January 2023, Kellner texted Deutsch about their "AIM game plan" and expressed his intention to "get this ball rolling!![hands clapping emoji; smiley emoji]"[144] On February 15, counsel at BakerHostetler sent Tudor and Deutsch's Florida counsel an email with the subject line "AIM Immunotech - Question re Share Ownership."[145] This message was forwarded by Deutsch's counsel to Deutsch and Kellner.[146] Kellner's associate sent back the requested figures reflecting the Kellner family's AIM holdings as of February 14, 2023.[147]

---

[141] JX 557.

[142] *Id.* at 2.

[143] At trial, Kellner testified that the "two individuals" joining him were Chioini and Rice. Kellner Tr. 245-46. But Chioini and Rice were not "investors." *See* JX 557. Kellner had just met Chioini. Moreover, Kellner's August 2022 draft update expressly referred to Tudor and Deutsch. *Compare* JX 522, *with* JX 557; *see also* Post-trial Oral Arg. Tr. (Dkt. 272) 33-34 (Kellner's counsel arguing that Kellner was "confused").

[144] JX 570; *see* Deutsch Tr. 199-200.

[145] JX 606 at 2.

[146] *Id.* at 1.

[147] *Id.*

24

## K.    The Amended Bylaws

Around this time, the Board began to consider amending AIM's advance notice bylaws.[148]  On March 17, Potter Anderson sent a proposed set of amendments to the Board.  An accompanying memo explained that certain amendments were in response "to significant activist activity during 2022 in which an activist group . . . engag[ed] in efforts to conceal who was supporting and who was funding the nomination efforts and to conceal the group's plans for the Company."[149]  There were also changes "to update and modernize certain aspects" of the bylaws and "bring the [b]ylaws in line with recent amendments to" the Delaware General Corporation Law.[150]  Many of the proposed amendments focused on the advance notice procedures governing stockholder proposals and nominations for director elections.[151]

During a March 20 Board meeting, AIM's directors discussed the possible bylaw amendments.[152]  Pittenger presented the amendments to the Board and described that "certain of the revisions [we]re designed to help better ensure that stockholders seeking to propose business or make nominations cannot attempt to

---

[148] Pittenger Tr. 712-13.

[149] JX 633 at 1.

[150] *Id.*

[151] *Id.* at 5-11.

[152] JX 646 at 1-2.

25

engage in the types of manipulative, misleading, and improper conduct in which Mr. Jorgl, his nominees, Mr. Tudor, and others acting in concert with them engaged in connection with their attempted nominations in 2022."[153] The Board discussed making additional changes.[154]

The Board concluded that the bylaw provisions were not "preclusive or unreasonably restrictive" of stockholders' ability to make proposals or nominations.[155] The directors determined that the amendments "clarified and enhanced the rules and procedures for providing advance notice of stockholder proposals and nominations and for regulating the conduct of stockholder meetings."[156] On March 28, after minor changes and revisions to reflect director feedback, the amendments were unanimously adopted by the Board (the "Amended Bylaws").[157]

---

[153] JX 647 at 2.

[154] *Id.*

[155] *Id.*

[156] *Id.*

[157] JX 679; *see* JX 686 ("Am. Bylaws").

On March 29, Kellner had a phone call with his attorney and Deutsch regarding AIM.[158]  On March 31, Chioini sent the Amended Bylaws to counsel at BakerHostetler.[159]

### L.    The Effort Blooms

During the spring of 2023, Kellner, Deutsch, and Chioini continued their work toward a potential proxy contest.  At some point in April or May, Kellner had breakfast with Tudor in Florida.[160]  The two discussed the efficacy of Ampligen.[161]

Other than this meeting, Tudor curiously faded from view.  He is now employed by Deutsch to do "back office" tasks.[162]  Tudor "works three hours a day" sending Deutsch's "trades to the prime brokers and the firms."[163]

On May 19, Kellner asked Deutsch to "[p]lease reach out [to Chioini] to hear what his plan and that of Teresa [Goody Guillén of BakerHostetler] is regarding AIM."[164]  Kellner continued: "Time is becoming critical in moving this ball forward.

---

[158] *See* JX 695.

[159] JX 700.

[160] Tudor Tr. 440-41.

[161] *Id.* at 442.

[162] Deutsch Tr. 161-62.

[163] *Id.* at 162; *see also* JX 407; Tudor Dep. 48-49.

[164] JX 740.

Let's please talk later today."[165]  Kellner followed that text with another to Chioini saying: "Todd will call you momentarily[.]"[166]

On June 15, counsel from BakerHostetler sent Kellner's attorney a financial breakdown of what a proxy contest would cost and the possible outcomes of that contest.[167]  Counsel advised "not to have the shares transferred into [Kellner's] name until we have all our ducks in a row lined up" and cautioned that if the notice was denied and litigated, the case could get assigned "to the Vice Chancellor who we had last year (who favors defendants, not us)."[168]  These emails were forwarded to Kellner, whose assistant printed them for him.[169]  Kellner's assistant relayed that Kellner would call Deutsch and Kellner's counsel the next day.[170]

Kellner's assistant next began coordinating a "series of private jet stops" two weeks later for a meeting at BakerHostetler's Washington, D.C. offices.[171]  The planned passengers were Kellner, Chioini, Deutsch, and Kellner's counsel.  Rice was to join by video conference.[172]

---

[165] *Id.*

[166] JX 745.

[167] JX 758 at 3-4.

[168] *Id.*

[169] *Id.* at 2.

[170] *Id.* at 1.

[171] JX 765; *see* Kellner Tr. 352.

[172] Chioini Tr. 30.

28

On July 11, the group met in Washington, D.C. as scheduled. Kellner characterized the meeting as a "final fact gathering meeting to determine what, if anything, we would do."[173] The next day, BakerHostetler sent a draft engagement letter to Kellner, Deutsch, Chioini, and Kellner's counsel.[174] On July 14, Kellner sent a text message to Deutsch and Chioini stating that he was willing to risk more and "commit more dollars proportionally to AIM going forward."[175] Kellner promised to "commit [a] million dollars" and so long as Deutsch and Chioini "committed $150,000," Kellner would also "commit the next $200k up to $1.5 million of legal cost[s]."[176] Kellner said that in his "view this [wa]s still a VERY good offer for" Deutsch and Chioini.[177] The final engagement letter with BakerHostetler was signed by Kellner, Deutsch, and Chioini on July 17.[178]

## M.    The Kellner Nomination

On July 24, Harrington emailed AIM on Kellner's behalf to request the Company's form of director and officer (D&O) questionnaire and a representation

---

[173] Kellner Tr. 354. Chioini and Rice both asserted privilege when asked about the discussions at the meeting. Chioini Dep. 138.

[174] JX 776.

[175] JX 781.

[176] *Id.*

[177] *Id.*

[178] JX 782 at 6.

and agreement referenced in the Amended Bylaws.[179]  The Amended Bylaws gave

AIM five business days to respond.[180]  In the interim, AIM revised its D&O

questionnaire to require additional information.[181]

On July 27, Kellner submitted a Schedule 13D filing with the SEC.[182]  The

filing stated Kellner "intend[ed] to provide notice to [AIM] of his intent to nominate

directors for election at the 2023 annual meeting of stockholders."[183]

On July 31, Rodino sent BakerHostetler the requested forms.[184]  The same

day, Equels contacted the Board to schedule a discussion about the "second attempt

of [a] hostile takeover."[185]

At 7:52 p.m. on August 3—the evening before the nomination deadline—

BakerHostetler submitted a letter from Kellner.[186]  The letter provided notice of

Kellner's intent to nominate himself, Chioini, and Deutsch as director candidates for

election at AIM's 2023 annual meeting (the "Kellner Notice").[187]

---

[179] JX 821 at 2-3.

[180] Am. Bylaws § 1.4(e).

[181] Pittenger Tr. 732-35; *see* JX 821 at 1; *compare* JX 858, *with* JX 1131, *and* JX 943.

[182] JX 831.

[183] *Id.* at 5.

[184] JX 1226 at 1.

[185] *See* JX 842.

[186] JX 870.

[187] *Id.* at 2; JX 875 ("Kellner Notice").

On August 7, AIM's outside communications advisor sent a draft press release to Equels, AIM's counsel, and AIM's investor relations representatives.[188] The draft said that "[a] hostile takeover of the Board would not only put shareholders' investments at risk, it would also be detrimental to the patients for whom we are working to bring new life-saving oncology therapies to market—most notably by repurposing our lead drug, Ampligen."[189] Counsel recommended revisions to the messaging since "no determination ha[d] been made yet as to whether the notice complies with AIM's advance notice bylaws."[190] The draft press release was a "contingency" that AIM would issue should they reject the Kellner Notice.[191] It was not shared with the Board beyond Equels.[192]

## N.  The Board's Rejection

The Board met on three occasions to discuss the Kellner Notice: August 8, August 21, and August 22.

On August 8, the Board held a 50 minute meeting at which Equels and counsel provided information about the 2022 proxy contest, the Amended Bylaws'

---

[188] JX 1140; *see* Equels Tr. 605-06.

[189] JX 1142 at 5.

[190] *Id.* at 4.

[191] Equels Tr. 606.

[192] *See id.* at 609.

31

requirements, and the process for evaluating the notice.[193]  During the meeting,

Equels noted that many of the players from Jorgl's 2022 nomination were involved

in Kellner's submission.[194]  Equels cautioned that "protecting stockholders was

paramount" in "view of the troubling background"—namely, the failed 2022

nomination, the "guns blazing" call in December 2022, and overlapping persons

present in the current and prior efforts.[195]  Equels also highlighted that Kellner,

Deutsch, and Chioini intended to seek "reimbursement from AIM for their expenses

relating to the 2023 Annual Meeting, as well as all the expenses (including litigation

expenses) incurred by the 2022 Group related to the 2022 Attempt."[196]  The Board

decided to hire Potter Anderson and Kirkland & Ellis LLP to evaluate the Kellner

Notice.[197]

Also on August 8, AIM's legal team filed a motion to alter or amend the

previous Florida order, or, alternatively, a motion for relief from the order.[198]  The

motion characterized the Kellner Notice as "fail[ing] to account for the remaining

8.5% to 11.5% of AIM common stock that Kellner believed the Group beneficially

---

[193] JXs 881-83.

[194] JX 883 at 1-3.

[195] *Id.* at 3.

[196] *Id.* at 2.

[197] *Id.* at 3; *see* Bryan Tr. 660.

[198] JX 878.

owned in 2022."[199]  It also claimed that Kellner and Deutsch's Schedule 13D filing was misleading since it "disclose[d] only a July 26, 2023 group agreement with Chioini, omitting any reference to their mutual cooperation in the attempted proxy contest in 2022 or any other member of the Group."[200]  These failings were, according to AIM, evidence that Kellner, Deutsch, and other group members posed an "ongoing . . . threat to AIM and its shareholders."[201]

The Board met again on August 21, with counsel in attendance.[202]  Before the meeting, counsel distributed materials to the Board that provided a chronological overview of the Kellner Notice, explained the Board's fiduciary duties in connection with its review of the notice, and analyzed whether the notice complied with the Amended Bylaws.[203]  These issues were discussed with the Board during the meeting.[204]

Counsel advised that they found numerous deficiencies in the Kellner Notice.[205]  These included:

---

[199] *Id.* at 9.

[200] *Id.* at 10.

[201] *Id.*

[202] JX 907; *see* Pittenger Tr. 740.

[203] JX 909; JX 911; *see* Pittenger Tr. 741-42.

[204] *See* JX 907 at 3-23.

[205] JX 909 at 14-21.

33

- undisclosed agreements, arrangements, and understandings, including between and among Kellner, Deutsch, Chioini, Lautz, Ring, and Xirinachs;

- failure to disclose known supporters of Kellner's purported nominations;

- failure to disclose specific dates of first contact between relevant parties; and

- other undisclosed information, including adverse recommendations from proxy advisor firms concerning other public company board service as called for in AIM's form of D&O questionnaire.[206]

After outlining these perceived deficiencies, counsel presented on "potential next steps."[207] Counsel also discussed "offensive litigation options" the Board could take against Kellner and his party.[208] The Board concluded that it needed additional time to consider the Kellner Notice and information provided by counsel.

The Board reconvened the following morning to continue its consideration of the Kellner Notice.[209] The Board unanimously approved resolutions rejecting the Kellner Notice for violating the Amended Bylaws. It observed that the notice was "designed to omit and conceal information and to provide incomplete or misleading disclosures that destabilize the important disclosure function that [AIM's] Advance

---

[206] *Id.*

[207] *Id.* at 23.

[208] *Id.* at 24.

[209] *See* JX 911 at 8-10.

34

Notice Provisions were designed to serve."[210]  The Board also authorized a letter to Kellner summarizing the notice's defects and the Board's rejection of the notice.[211]

On August 23, AIM's counsel notified BakerHostetler that the Kellner Notice had been rejected.[212]  The letter detailed the notice's deficiencies and noncompliance with provisions of the Amended Bylaws.[213]  It also highlighted that because the deadline for submitting a timely nomination notice had passed, "any nominations that purport to be made pursuant to the [Kellner] Notice w[ould] be disregarded and [not] considered at the 2023 Annual Meeting."[214]

Later that day, BakerHostetler circulated emails with the subject line "Re: Draft Complaint – AIM Nomination Notice Litigation" to Chioini, Kellner, Deutsch, and others.[215]  On August 28, the Kellner group issued a press release urging AIM stockholders to "disregard communications by AIM and its Board" with respect to the proxy contest.[216]  It also announced that Kellner had filed litigation.

---

[210] *Id.* at 9-10.

[211] *Id.*

[212] JX 378.

[213] *Id.*; JX 918.

[214] JX 378 at 14.  Kellner attempted to submit a supplemental nomination notice on October 9 during this litigation.  JX 975.

[215] JX 925 at 2.

[216] JX 929 at 1.

### O.    This Litigation

On August 25, Kellner filed a Verified Complaint in this court against AIM and its directors.[217]  It advances three counts.  Count I seeks a declaration that the Amended Bylaws are invalid.[218]  Count II seeks, additionally and alternatively, a declaration that the Board's application of the Amended Bylaws to reject Kellner's notice is unlawful and inequitable.[219]  Count III seeks a declaration that the Board members breached their fiduciary duties by adopting the Amended Bylaws and rejecting Kellner's notice.[220]

On September 11, the defendants answered the complaint and AIM filed a counterclaim against Kellner.[221]  The counterclaim seeks a declaratory judgment that the Amended Bylaws are valid and lawful.[222]

After expedited discovery, a three day trial was held on October 30 through November 1.[223]  Post-trial argument was held on November 21.[224]  After submissions regarding a trial exhibit submitted for *in camera* review were filed, the matter was

---

[217] Dkt. 1

[218] Compl. ¶¶ 103-13.

[219] *Id.* ¶¶ 114-28.

[220] *Id.* ¶¶ 129-33.

[221] Defs.' Answer to Verified Compl. and Verified Countercl. (Dkt. 13) ¶¶ 100-01.

[222] *Id.* ¶¶ 67-73.

[223] Dkt. 256.

[224] Dkt. 268.

taken under advisement on December 5.[225]  AIM's 2023 annual meeting is set to occur on or around December 29.[226]

## II.    LEGAL ANALYSIS

Kellner challenges both the Board's adoption and application of the Amended Bylaws.  He first argues that the Amended Bylaws are invalid.[227]  He next asserts that his notice complied with the Amended Bylaws' requirements and that, even if it did not, the Board applied the Amended Bylaws inequitably.  The defendants contend that the converse is true.[228]

---

[225] Dkts. 269, 271.

[226] Dkt. 270.  At least, it was set to occur on December 29 as of the time that this decision was being prepared for filing.  The afternoon of December 28—at the proverbial eleventh hour—counsel alerted chambers that AIM would push back its annual meeting another week.  I am unaware of the new annual meeting date.

[227] According to Kellner, AIM's corresponding counterclaim "should have been asserted . . . [a] compulsory counterclaim[] in the Jorgl Action."  Pl.'s Pre-trial Br. (Dkt. 243) 59-61.  As the defendants correctly point out, however, AIM seeks a declaratory judgment regarding Kellner's nomination notice—not Jorgl's.  Defs.' Post-trial Br. (Dkt. 261) 69.  The court "is not confronted with a situation in which a [counter]plaintiff has filed a second action against defendants they previously sued regarding the same transaction."  *Grunstein v. Silva*, 2011 WL 378782, at *8 (Del. Ch. Jan. 31, 2011).  AIM's counterclaim is properly raised in this action.

[228] The defendants aver that the doctrine of unclean hands "bar[s] [Kellner's] claims for equitable relief."  Defs.' Post-trial Br. 70.  The court "has broad discretion" to apply the doctrine.  *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015) (citation omitted).  I decline to do so here.  Kellner's conduct was not "so offensive to the integrity of the court that [his] claims should be denied, regardless of their merit."  *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008) (quoting *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. Aug. 16, 1991)).

My analysis of these arguments proceeds in three steps. I begin by considering the policy and practice integral to advance notice bylaws. With those principles in mind, I assess whether the Amended Bylaws at issue are facially valid. I then consider whether Kellner satisfied the relevant advance notice bylaws and whether the Board acted reasonably in rejecting the Kellner Notice.

## A. The Role of Advance Notice Bylaws

Delaware law recognizes that stockholders have a fundamental right to participate in the voting process, including the right to nominate directors.[229] Yet the Delaware General Corporation Law is nearly silent on how a stockholder should nominate a director candidate for election.[230] As a result, public companies commonly implement advance notice bylaws to promote "orderly meetings and election contests."[231]

---

[229] *E.g.*, *EMAK Worldwide, Inc. v. Kurz*, 50 A.3d 429, 433 (Del. 2012) ("The fundamental governance right possessed by shareholders is the ability to vote for the directors the shareholder wants to oversee the firm. Without that right, a shareholder would more closely resemble a creditor than an owner.").

[230] *See* JX 973 (Expert Report of Edward Rock) ("Rock Report") ¶ 23; 8 *Del. C.* § 211(b).

[231] *Openwave Sys. Inc. v. Harbinger Cap. P'rs Master Fund I, Ltd.*, 924 A.2d 228, 239 (Del. Ch. 2007); *see also BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd.*, 224 A.3d 964, 980 (Del. 2020) (describing advance notice bylaws as "commonplace" (quoting *Goggin v. Vermillion, Inc.*, 2011 WL 2347704, at *4 (Del. Ch. June 3, 2011))); 8 *Del. C.* § 109(b).

Modern advance notice bylaws have two primary functions: timing and disclosure.[232] Regarding the former, advance notice bylaws set a deadline "by which stockholders must give notice of their intention to nominate director candidates in advance of an annual meeting."[233] In furtherance of the latter, advance notice bylaws may require stockholders to provide information "allowing boards of directors to knowledgably make recommendations about nominees and ensuring that stockholders cast well-informed votes."[234]

Advance notice bylaws have evolved over time to serve these purposes. So-called first generation advance notice bylaws obligated the proponent stockholder to notify the company of its intention to nominate by a fixed time before the meeting date and to provide basic information about the stockholder and its nominees.[235] In

---

[232] *See Openwave Sys.*, 924 A.2d at 238-39; *Sternlicht v. Hernandez*, 2023 WL 3991642, at *14 (Del. Ch. June 14, 2023) (explaining that advance notice bylaws "serve dual purposes: marshalling orderly meetings and election contests where the nominees are fixed in advance of the annual meeting, and providing fair warning to the corporation so that it can respond to stockholder nominations"); *see also* Arthur Fleischer, Jr., Gail Weinstein, & Scott B. Luftglass, *Takeover Defense: Mergers and Acquisitions*, § 6.06[C][1] (9th ed. 2022) ("Advance notice bylaw provisions provide several benefits to a company, including giving a board time to evaluate the proposed candidates and preventing last-minute 'surprise attacks' by third parties for control or board representation.").

[233] *Strategic Inv. Opportunities LLC v. Lee Enters., Inc.*, 2022 WL 453607, at *9 (Del. Ch. Feb. 14, 2022).

[234] *Id.*

[235] *See Nomad Acquisition Corp. v. Damon Corp.*, 1988 WL 383667, at *8 (Del. Ch. Sept. 20, 1988) (considering whether the plaintiffs had a reasonable probability of success in their challenge to the validity of a bylaw requiring stockholders to provide 60 days of notice before submitting a nomination for a director election); *see also Hubbard v. Hollywood Park Realty Ent., Inc.*, 1991 WL 3151, at *11 (Del. Ch. Jan. 14, 1991) (addressing an

response to case law developments and activism trends, a second generation of advance notice bylaws emerged post-2008 that expanded on these requirements. Second generation advance notice bylaws often include provisions mandating the completion of nominee questionnaires and the disclosure of derivative positions, compensation information, and persons acting in concert with the stockholder proponent and its nominees.[236] The scope of typical advance notice bylaws continues to develop through an iterative process as new case law, rules, and regulations emerge.[237]

Advance notice bylaws are an area of renewed focus after the SEC's November 2021 adoption of Rule 14a-19, which requires registrants to use a universal proxy card in contested elections.[238] Previously, the company and a

---

advance notice bylaw requiring the movants to give notice of their intent to nominate a competing slate of directors in light of a material post-deadline change of position by the incumbent directors).

[236] *See* Donald F. Parsons & Jason S. Tyler, *Activist Stockholders, Corporate Governance Challenges, and Delaware Law*, RESEARCH HANDBOOK ON MERGERS & ACQUISITIONS 7 n.13 (Claire A. Hill & Steven Davidoff Solomon eds., 2016); *see also* Marc Weingarten & Erin Magnor, *Second Generation Advance Notification Bylaws*, Harvard Law School Forum on Corporate Governance (Mar. 17, 2009), https://corpgov.law.harvard.edu/ 2009/03/17/second-generation-advance-notification-bylaws/; Charles Nathan, *Second Generation Advance Notice Bylaws and Poison Pills*, Harvard Law School Forum on Corporate Governance (Apr. 22, 2009), https://corpgov.law.harvard.edu/2009/04/22 /second-generation-advance-notice-bylaws-and-poison-pills/.

[237] Rock Report ¶ 25.

[238] 17 CFR § 240.14a-19; *see* U.S. Securities and Exchange Commission, *Final Rule, Universal Proxy*, https://www.sec.gov/rules/2021/11/universal-proxy (last visited Dec. 16, 2023).

dissident stockholder nominating director candidates would each distribute separate proxy cards. Now, the company must include the dissident nominees on a universal proxy card, allowing stockholders to mix and match between slates.[239] Numerous public companies have amended their advance notice bylaws to account for the rule change.[240] Many have also taken the opportunity to revisit and enhance other advance notice requirements.[241] Some have gone to extremes.[242]

---

[239] *See* U.S. Securities and Exchange Commission, *Universal Proxy*, https://www.sec.gov/corpfin/universal-proxy-secg (last visited Dec. 16, 2023) ("The amendments will allow shareholders voting by proxy to choose among director nominees in an election contest in a manner that more closely reflects the choice they could make by voting in person at a shareholder meeting.").

[240] *See* Rock Report ¶ 26 (citing Aaron Wendt & Krishna Shah, *2023 Proxy Season Briefing: Key Trends and Data Highlights*, Harvard Law School Forum on Corporate Governance (Aug. 17, 2023), https://corpgov.law.harvard.edu/2023/08/17/2023-proxy-season-briefing-key-trends-and-data-highlight/ ("More than 685 companies in our coverage amended advance notice bylaws in response to universal proxy[.]")); *id.* ¶ 37; *see also* Douglas K. Schnell & Daniyal Iqbal, *Lessons from the 2023 Proxy Season: Advance Notice Bylaws and Officer Exculpation*, Harvard Law School Forum on Corporate Governance (Sept. 5, 2023), https://corpgov.law.harvard.edu/2023/09/05/lessons-from-the-2023-proxy-season-advance-notice-bylaws-and-officer-exculpation/ ("[O]f the 70 companies in the SV150 that amended their bylaws between November 1, 2021, and July 31, 2023, 50 amended their bylaws explicitly to address Rule 14a-19, with 90 percent of those amendments occurring after the August 31, 2022, effective date of Rule 14a-19."); Maia Gez et al., *Amending Charters to Address Universal Proxy, Shareholder Activism and Officer Exculpation*, Harvard Law School Forum on Corporate Governance (July 10, 2023), https://corpgov.law.harvard.edu/2023/07/10/amending-charters-to-address-universal-proxy-shareholder-activism-and-officer-exculpation/ (reporting that based on a law firm survey, "200 companies in the S&P 500 have amended their bylaws to address the SEC's universal proxy rule and shareholder activism").

[241] *See supra* note 240 (listing sources).

[242] *E.g.*, Verified Compl. for Breach of Fiduciary Duties, *Politan Capital Mgmt. L.P. v. Kiani*, C.A. No. 2022-0948-NAC (Del. Ch. Oct. 21, 2022) (Dkt. 1) (challenging the validity of advance notice bylaws requiring any stockholder seeking to nominate directors to identify, among other things, the investment fund's limited partners, all arrangements or

Since the universal proxy rules took effect in August 2022, this court has only begun to hear disputes involving the wave of new and amended advance notice bylaws.[243] Even with this limited set, it is apparent that the court must—more than ever—carefully balance the competing interests at play.[244] On one hand, it is legitimate for companies to refresh their bylaws to comport with SEC rules and further the twin goals of order and disclosure. On the other hand, onerous bylaws that stray far afield from these purposes risk frustrating any nomination of alternative director candidates.

Advance notice requirements are "often construed and frequently upheld as valid by Delaware courts"—particularly those adopted on a clear day.[245] But the discretion afforded a board's adoption of advance notice bylaws is not limitless.[246] If advance notice bylaws that materially interfere with stockholders' voting rights

---

understandings between the limited partners and their family members, and plans the fund has to nominate directors at other companies in the next year).

[243] *See, e.g.*, *id.*; *Paragon Techs., Inc. v. Cryan*, 2023 WL 8269200 (Del. Ch. Nov. 30, 2023) (addressing a challenge to bylaws adopted after the universal proxy rules were enacted).

[244] *See Paragon Techs.*, 2023 WL 8269200, at *7 (remarking that the corporate goals of advance notice bylaws "must be carefully balanced against stockholders' 'fundamental governance right' of voting for directors" (quoting *Kurz*, 50 A.3d at 433)).

[245] *Openwave Sys.*, 924 A.2d at 239.

[246] *See Lee Enters.*, 2022 WL 453607, at *14 ("*Schnell* empowers the court to invalidate certain board actions, including those that inequitably manipulate the corporate machinery to impair the rights of stockholders. Put simply, directors' inequitable acts towards stockholders do not become permissible because they are legally possible." (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971))).

are implemented, the justification for judicial deference is diminished.[247] Thus, constraints on stockholder voting power must be reasonably tailored to a legitimate corporate end. Bylaws that "unduly restrict the stockholder franchise or are applied inequitably [] will be struck down."[248]

## B.    The Adoption Claim

Kellner contends that the defendants breached their fiduciary duties by approving the Amended Bylaws. In Kellner's view, the Amended Bylaws were adopted for the inequitable purpose of thwarting stockholders' ability to run a competing slate of director nominees.[249] He asks that I declare the Amended Bylaws invalid, meaning that AIM has no advance notice bylaws and must place his slate on the 2023 ballot.

Enhanced scrutiny—Delaware's intermediate equitable standard of review[250]—guides my assessment of this claim. Unlike the 2016 Bylaws, the

---

[247] *See* Jill E. Fisch, *Governance by Contract: The Implications for Corporate Bylaws*, 106 CALIF. L. REV. 373, 409 (2018) ("[S]everal aspects of existing law limit the ability of shareholders to participate on an equal footing with boards in the private ordering process. This asymmetry undermines the justification for broad judicial deference.").

[248] *Openwave Sys.*, 924 A.2d at 239.

[249] Pl.'s Post-trial Br. (Dkt. 260) 23.

[250] *See generally In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 (Del. Ch. 2013) ("Enhanced scrutiny is Delaware's intermediate standard of review. Framed generally, it requires that the defendants 'bear the burden of persuasion to show that their motivations were proper and not selfish' and that 'their actions were reasonable in relation to their legitimate objective.'" (quoting *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007))).

Amended Bylaws were not adopted on a clear day.[251] The skies were overcast in March 2023, with storm clouds of a proxy contest gathering on the horizon.[252]

Kellner argues that because enhanced scrutiny applies, the Board must prove that it had a "compelling justification" for its actions.[253] He misstates the applicable standard of review.[254] Instead, as the Delaware Supreme Court recently pronounced in *Coster*, the court should apply *Unocal* "with sensitivity to the stockholder franchise" that integrates the spirit of *Blasius* and *Schnell*.[255]

---

[251] *Cf. Jorgl*, 2022 WL 16543834, at *15 (finding that the 2016 Bylaws were "adopted on a clear day . . . long before Tudor, Xirinachs, or Jorgl entered the picture"); *see also AB Value P'rs, LP v. Kreisler Mfg. Corp.*, 2014 WL 7150465, at *3 (Del. Ch. Dec. 16, 2014) (upholding an advance notice bylaw adopted on a "clear day" that was "long before the present proxy challenge was contemplated by" the challengers).

[252] *See infra* notes 269-72 and accompanying text (discussing the Board's awareness of the potential for another proxy contest).

[253] Pl.'s Pre-trial Br. 2; *see also id.* at 3, 29, 31-32, 37; Pl.'s Post-trial Br. 2-4, 26.

[254] *See Lee Enters.*, 2022 WL 453607, at *16 (explaining that review of board action in the advance notice bylaw context is fundamentally "one of reasonableness" viewed through *Unocal*); *see also Mentor Graphics v. Quickturn Design Sys.*, 728 A.2d 25, 43 (Del. Ch. 1998) (rejecting a challenge to an advance notice bylaw based on "the fiduciary principles embodied in *Unocal*"); *Mercier*, 929 A.2d at 788, 810.

[255] *Coster v. UIP Cos., Inc.*, 300 A.3d 656, 673 (Del. 2023) ("Experience has shown that *Schnell* and *Blasius* review, as a matter of precedent and practice, have been and can be folded into *Unocal* review to accomplish the same ends—enhanced judicial scrutiny of board action that interferes with a corporate election or a stockholder's voting rights in contests for control." (citing Lawrence A. Hamermesh et. al., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 BUS. LAW. 321, 331 (2022))).

44

This approach "requires a context-specific" review of the directors' conduct.[256] "Fundamentally, the standard to be applied is one of reasonableness."[257] First, the court "review[s] whether the board faced a threat 'to an important corporate interest or to the achievement of a significant corporate benefit.'"[258] Second, the court "review[s] whether the board's response to the threat was reasonable in relation to the threat posed and was not preclusive or coercive to the stockholder franchise."[259] The defendants bear the burden of proof.[260]

Here, the Amended Bylaws are a mixed bag. Certain of the Amended Bylaws reflect changes to address Rule 14a-19 and cohere with the DGCL.[261] Kellner does not quibble with these amendments,[262] and neither will I. Other aspects of the

---

[256] *Coster*, 300 A.3d at 671 (quoting *Lee Enters.*, 2022 WL 453607, at *16); *see also Paragon Techs.*, 2023 WL 8269200, at *12.

[257] *Lee Enters.*, 2022 WL 453607, at *16; *see In re Gaylord Container Corp. S'holders Litig.*, 753 A.2d 462, 474-75 (Del. Ch. 2000) ("In itself, the *Unocal* test is a straightforward analysis of whether what a board did was reasonable."); *see also In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) ("In a situation where heightened scrutiny applies, the predicate question of what the board's true motivation was comes into play. The court must take a nuanced and realistic look at the possibility that personal interests short of pure self-dealing have influenced the board['s decision making].").

[258] *Coster*, 300 A.3d at 672 (quoting *Phillips v. Instituform of N. Am., Inc.*, 1987 WL 16285, at *7 (Del. Ch. Aug. 27, 1987)).

[259] *Id.* at 672-73.

[260] *Id.* at 672.

[261] *E.g.*, Am. Bylaws §§ 1.4(c)(3)(b), 1.4(g); *see* JX 647; JX 635; Mitchell Tr. 637; Appelrouth Tr. 687; Pittenger Tr. 712-13, 719-20.

[262] Pl.'s Post-trial Br. 31 ("The updates to technical mechanics . . . and those addressing legal developments . . . are not at issue.").

Amended Bylaws are bolstered disclosure requirements that Kellner insists are inequitable and invalid. Although the Board has proven it reasonably identified a threat to proper corporate objectives that prompted it to amend AIM's bylaws, it has failed to show that certain of the provisions are proportionate in relation to those objectives.

### 1. Reasonableness

The first *Unocal* prong requires the Board to demonstrate that it conducted a reasonable and good faith investigation through which it identified "grounds for concluding that a threat to the corporate enterprise existed."[263] The classic *Unocal* pattern is an imperfect fit for advance notice bylaws. "Corporate democracy is not an attack" in and of itself.[264] The threat identified cannot simply be that the board feels certain director nominees would be worse for the company than themselves.[265]

---

[263] *Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 599 (Del. 2010); *accord Coster*, 300 A.3d at 661-62.

[264] *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 2180240, at *15 (Del. Ch. June 16, 2022).

[265] *See Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 663 (Del. Ch. 1988) (explaining that though it may be true "for any number of matters" that "the board knows better" than shareholders what is in the company's best interest, "it is irrelevant (except insofar as the shareholders wish to be guided by the board's recommendation) when the question is who should comprise the board of directors"); *see also Coster*, 300 A.3d at 672 ("As Chancellor Allen stated long ago, the threat cannot be justified on the grounds that the board knows what is in the best interests of the stockholders."); *Mercier*, 929 A.2d at 811.

Instead, the threat must be to matters of "corporate policy and effectiveness which touches on issues of control."[266]

AIM's Board had an objective of obtaining transparency from a stockholder seeking to nominate director candidates. The Board's Delaware counsel advised it on the importance of knowing "who is making and supporting [a] proposal or nominations" and "whether they have conflicts of interest or other interests, motives, or plans that should be disclosed to the board and stockholders."[267] The Board asked counsel to update AIM's advance notice bylaws "to better protect AIM and its stockholders against potentially abusive and deceptive practices."[268]

The Board made a reasonable assessment, in reliance on the advice of counsel, that this information-gathering objective was threatened.[269] AIM had just endured a proxy contest where it seemed that the nominating stockholder was a façade concealing the identities of individuals responsible for the effort.[270] By December 2022, the Board had reason to believe that the group behind the prior proxy contest

---

[266] *In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *7 (Del. Ch. July 17, 2018) (citation omitted).

[267] JX 635 at 5; *see also* Equels Tr. 524; Mitchell Tr. 638.

[268] JX 635 at 1.

[269] *See id.*; Equels Tr. 525, 531; Appelrouth Tr. 688; Pittenger Tr. 827.

[270] *See* JX 647; *Jorgl*, 2022 WL 16543834, at *17.

was "threatening to revive [its] efforts" for the 2023 election.[271]  In revisiting AIM's advance notice bylaws, the Board sought to prevent "the types of manipulative, misleading, and improper conduct" experienced in 2022 from happening again.[272]

## 2.    Proportionality

The second *Unocal* prong requires the court to undertake a substantive review of the Board's response to the perceived threat.[273]  I begin by considering whether the Amended Bylaws are "draconian, by being either preclusive or coercive."[274]  If they are not, I must assess whether the challenged provisions fall "within a range of reasonable responses" in relation to the corporate interest at risk.[275]

Kellner asserts that the Amended Bylaws are preclusive because they eliminate any prospect of election competition and coercive because they prevent dissident nominations, leaving the incumbents as the sole choice.[276]  This coercion

---

[271] JX 600 at 5; *see also* Equels Tr. 624; Pittenger Tr. 712; Mitchell Dep. 188-90; Pittenger Dep. 73-74; JX 526; JX 601; JX 940; JX 948.

[272] JX 647.

[273] *Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 92 (Del. Ch. 2011) ("Once the board has reasonably perceived a legitimate threat, *Unocal* prong 2 engages the Court in a substantive review of the board's defensive actions: Is the board's action taken in response to that threat proportional to the threat posed?").

[274] *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1367 (Del. 1995).

[275] *Id.*

[276] Pl.'s Post-trial Br. 37 (citing *Chesapeake Corp. v. Shore*, 711 A.2d 293, 333-34 (Del. Ch. 2000)); *see also* Pl.'s Pre-trial Br. 39.

argument rests on the premise that the bylaws are preclusive. If the bylaws were not preclusive, then the vote would be uncoerced.

A measure is preclusive if it makes a dissident's "ability to wage a successful proxy contest . . . 'realistically unattainable.'"[277] The Amended Bylaws are lengthy, dense, and require meaningful effort to satisfy. That does not mean that they are preclusive.[278] The line may be crossed where bylaws contain requirements that unduly restrict the stockholder franchise.[279]

Kellner focuses on six specific provisions of the Amended Bylaws in arguing that the Board's response was out of line with its objectives.[280] For two provisions,

---

[277] *Selectica*, 5 A.3d at 601 (citing *Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1195 (Del. Ch. 1998)).

[278] *See Yucaipa Am. All. Fund II, L.P. v. Riggio*, 1 A.3d 310, 354 (Del. Ch. 2010) (holding that a rights plan was not coercive where the plaintiff could "succeed in a proxy contest"), *aff'd*, 15 A.3d 218 (Del. 2011); *Unitrin*, 651 A.2d at 1383.

[279] *See JANA Master Fund, Ltd. v. CNET Networks, Inc.*, 954 A.2d 335, 344 (Del. Ch. 2008) (warning that "when advance notice bylaws unduly restrict the stockholder franchise . . . they will be struck down" (citing *Openwave Sys.*, 924 A.2d at 239)), *aff'd*, 947 A.2d 1120 (Del. 2008) (TABLE).

[280] Pl.'s Post-trial Br. 8-11. Various other provisions were addressed at times in pre-trial briefing or in expert reports. Given the expedited nature of this decision, it is unnecessary (and would be irresponsible) to opine on every provision that changed between the 2016 Bylaws and Amended Bylaws. I therefore focus on the provisions expressly challenged in Kellner's post-trial brief. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) (noting that a party waived an argument by omitting it from post-trial briefing); *Oxbow Carbon & Mineral Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial." (citation omitted)).

49

the Board proved that they are non-preclusive and reasonable means to obtaining enhanced disclosure. It fell short regarding four others.

### a. The AAU Provision

Section 1.4(c)(1)(D) of the Amended Bylaws (the "AAU Provision") requires the disclosure of all arrangements, agreements, or understandings ("AAUs"), "whether written or oral, and including promises," relating to a Board nomination.[281] Generally speaking, this bylaw promotes a proper corporate objective: enabling the

---

[281] Am. Bylaws § 1.4(c)(1)(D). The full text of the provision states:

> a complete and accurate description of all agreements, arrangements or understandings (whether written or oral, and including promises) between or among any two or more of any Holder, any Stockholder Associated Person (as such terms "Holder" and "Stockholder Associated Person" are defined in this Section 1.4), any Stockholder Nominee, any immediate family member of such Stockholder Nominee, any Affiliate or Associate of such Stockholder Nominee, any person or entity acting in concert with any of the foregoing persons or entities with respect to the nominations or the Corporation (including the full legal name (and any alias names) of any such person or entity acting in concert), and/or any other person or entity (including the full legal name (and any alias names) of any such person or entity), existing presently or existing during the prior twenty-four (24) months relating to or in connection with the nomination of any Stockholder Nominee or any other person or persons for election or re-election as a director of the Corporation, or pursuant to which any such nomination or nominations are being made, or relating to or in connection with the funding or financing of any nomination or nominations of any person or persons (including, without limitation, any Stockholder Nominee) for election or re-election to the Board of Directors, including, without limitation, the funding or financing of any proxy solicitation or litigation relating to such nomination or nominations.

*See infra* note 293 (defining "Holder"); *infra* note 294 and accompanying text (defining "Stockholder Associated Person," "Affiliate," and "Associate").

Company and Board to evaluate who is making and supporting a proposal.[282]  Such

information would also be important to stockholders' consideration of a nominator

or nominees' motivations when voting to elect directors.[283]

The AAU Provision builds on a similar requirement found in the 2016

Bylaws.[284]  The record suggests that the AAU Provision was amended in 2023 to

better "protect AIM and its stockholders against potentially abusive and deceptive

practices by activists or hostile acquirors."[285]  The Board would have been sensitive

---

[282] *See* JX 635; *see also* Equels Tr. 524; Mitchell Tr. 638.

[283] *See Jorgl*, 2022 WL 16543834, at *16 ("[This] information would have been important to stockholders in deciding which director candidates to support."); *see also Brisach v. The AES Corp.*, C.A. No. 4287-CC, at 21 (Del. Ch. July 8, 2009) (TRANSCRIPT) (noting that a diminished disclosure requirement "impoverishes the informational base available to other investors in a situation when it may be extremely relevant to know what the economic motivations are of the proponents of some important corporate action"); Rock Report ¶¶ 60, 68 (observing that many public companies have AAU provisions in their advance notice bylaws).

[284] The 2016 Bylaw provision stated:

> For any Stockholder Proposal that seeks to nominate persons to stand for election as directors of the Corporation, the stockholder's notice also shall include (i) a description of all arrangements or understandings between such stockholder and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made.

JX 23 at 4.  This version of the bylaw was adopted on a clear day.  *See Jorgl*, 2022 WL 16543834, at *15 (stating that the 2016 Bylaws were "adopted on a clear day").

[285] *See* JX 635; JX 647 at 2 (counsel advising that "certain of the revisions are designed to help better ensure that stockholders seeking to propose business or make nominations cannot attempt to engage in the types of manipulative, misleading, and improper conduct" observed in 2022).

51

to this risk given its experience in the 2022 proxy contest where a nominating stockholder seemingly evaded disclosure requirements.

As before, the Board's objective to discover AAUs behind a nomination is reasonable.[286] But Kellner argues that the revised AAU Provision's terms sweep too far.[287] He highlights two aspects of the AAU Provision that he deems particularly problematic.

First, the AAU Provision contains a bespoke 24-month lookback provision.[288] The record reflects that this term was added after Equels questioned whether the bylaw was ambiguous since it did not specify the time period for which AAUs were to be disclosed.[289] The Board wanted to clarify this in light of the 2022 proxy contest, where the plaintiff took the position that certain persons had dropped out of the contest just before the nomination notice was submitted.[290] The revision adopted by the Board reduced the risk of gamesmanship through overly narrow readings of the bylaw. The 24-month period was chosen after the Board considered that the

---

[286] *See Jorgl*, 2022 WL 16543834, at \*16 ("There are legitimate reasons why the Board would want to know whether a nomination was part of a broader scheme relating to the governance, management, or control of the Company.").

[287] Pl.'s Pre-trial Br. 39; Pl.'s Post-trial Br. 37-38.

[288] Rock Tr. 807.

[289] Pittenger Tr. 722 (expressing agreement with Equels that the bylaw was ambiguous since "it wasn't clear if it was just seeking present, current [AAUs] that are still in effect or whether it goes back in time. And if it goes back in time, does it go back to the beginning of time.").

[290] *See id.* at 722-23.

2022 nomination followed about 18 months of activity.[291]  The lookback is neither preclusive nor unreasonable.  A stockholder could easily understand what it requires and disclose information accordingly.

Second, the AAU Provision requires a nominating stockholder to disclose AAUs both with persons acting in concert with the stockholder and any "Stockholder Associated Person" (or "SAP").[292]  Stockholder Associated Person is defined, in relation to a "Holder,"[293] as:

> (i) any person acting in concert with such Holder with respect to the Stockholder Proposal or the Corporation, (ii) any person controlling, controlled by, or under common control with such Holder or any of their respective Affiliates and Associates, or a person acting in concert therewith with respect to the Stockholder Proposal or the Corporation, and (iii) any member of the immediate family of such Holder or an Affiliate or Associate of such Holder.[294]

---

[291] Equels Tr. 529-30; Pittenger Tr. 724.

[292] Am. Bylaws § 1.4(c)(1)(D).  I note that the SAP term is used at least thirty times in the Amended Bylaws, typically alongside additional references to persons acting in concert with, a family member of, or in another relationship with other persons.  Unless the information is required to be disclosed under SEC rules or regulations, the use of the SAP term appears quite broad in a number of instances.  I decline to issue an advisory opinion on every provision mentioning SAPs.  Instead, I have addressed the use of the term in the Amended Bylaw provisions that Kellner raises in his post-trial brief and that are relevant to my expedited determination of whether Kellner's nominees should be placed on the 2023 ballot.

[293] "Holder" is defined as the nominating stockholder and each beneficial holder on whose behalf the nomination is made.  Am. Bylaws § 1.4(i)(6).

[294] Am. Bylaws § 1.4(i)(8).  "Affiliate" and "Associate" have "the meaning[s] attributed to such term[s] in Rule 12b-2 under the Exchange Act."  *Id.* § 1.4(c)(i)(1), (2); *see* 17 CFR § 240.12b-2 (stating that "[a]n 'affiliate' of, or a person 'affiliated' with, a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified"); *id.* (stating that

In the context of the AAU Provision, a nominating stockholder would need to disclose any AAUs that an SAP had with a holder, nominee (and his or her immediate family members, affiliates, or associates), persons acting in concert with any SAP, holder, nominee (and family, affiliates, or associates), and "any other person or entity."[295]

It is here that the AAU Provision goes off the rails, undermining an otherwise reasonable and appropriate bylaw. Read literally, the interplay of the various terms—"acting in concert," "Associate," "Affiliate," and "immediate family" within the SAP definition, and SAPs within the AAU Provision—causes them to multiply, forming an ill-defined web of disclosure requirements.[296] For example, if the mother of an associate of a beneficial holder had an agreement with the estranged sister of a nominee to finance the nomination of a third-party nominee to the Board (who is unknown to both the nominating stockholder and the nominee), then the nominating

---

"the term 'associate' used to indicate a relationship with any person, means (1) any corporation or organization (other than the registrant or a majority-owned subsidiary of the registrant) of which such person is an officer or partner or is, directly or indirectly, the beneficial owner of 10 percent or more of any class of equity securities, (2) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (3) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of the registrant or any of its parents or subsidiaries").

[295] Am. Bylaws § 1.4(c)(1)(D).

[296] *See supra* notes 281, 293-94 and accompanying text.

stockholder would (arguably) be required to mention it in the notice.[297] The nominating stockholder would also seemingly be required to disclose an oral arrangement between the brother of an affiliate of a beneficial holder of the stockholder and any "any other person" "relating to or in connection with" AIM director nominations.[298] There are unending permutations of this hypothetical.[299]

The Board presented no evidence to suggest that the inclusion of broadly defined SAPs in the AAU Provision is proportionate to its objective of preventing stockholders from misconstruing and evading the Amended Bylaws' disclosure requirements.[300] The expansive text is more akin to a tripwire than an information

---

[297] This interpretation reads the phrase "any member of the immediate family of such Holder or an Affiliate or Associate of such Holder" in the definition of SAP to mean an immediate family member of: (1) the Holder, or (2) an Affiliate of the Holder or (3) an Associate of the Holder. One could also read it to mean the family member of the Holder *or* an Associate of the Holder *or* an Affiliate of the Holder.

[298] Am. Bylaws § 1.4(c)(1)(D).

[299] *Cf. Williams Cos. S'holder Litig.*, 2021 WL 754593, at *37 (Del. Ch. Feb 26, 2021) (finding a rights plan's "acting in concert" feature to unreasonably "sweep[] up benign stockholder communications," giving the board discretion to determine if the plan was triggered, and using language that "gloms on" a "daisy-chain concept that operates to aggregate stockholders even if members of the group have no idea that other stockholders exist"), *aff'd*, 264 A.3d 641 (Del. 2021) (TABLE).

[300] The defendants argue that incorporation of the SAP term in the AAU Provision does not cause the nominator and nominees to disclose persons "unlinked" to them. Defs.' Post-trial Br. 38. They believe that is fair to require the nominator and nominees "to disclose any AIM nomination related AAUs among, on the one hand, themselves or persons with whom they have a discernable connection—family members, SAPs, persons acting in concert with SAPs, etc.—and, on the other hand, any other person or entity." *Id.* Yet the inclusion of the SAP definition (and terms within it) significantly expands the scope of what a nominator is obligated to disclose. The requirement is far more onerous than the

gathering tool. It renders the AAU Provision overbroad, unworkable, and ripe for subjective interpretation by the Board.[301] Knowing that a proxy contest was coming, augmenting the AAU Provision with vague requirements about far-flung, multi-level relationships suggests an intention to block the dissident's effort.

### b. The Consulting/Nomination Provision

Section 1.4(c)(1)(E) of the Amended Bylaws requires disclosure of AAUs between the nominating stockholder or an SAP, on one hand, and any stockholder nominee, on the other hand, regarding consulting, investment advice, or a previous nomination for a publicly traded company within the last ten years (the "Consulting/Nomination Provision").[302] The provision not only suffers from the

---

closest comparator provision found in the defendants' expert's sample set. *See* JX 985 (Rebuttal Report of Andrew M. Freeman) ("Freeman Report") ¶¶ 58-59; Rock Tr. 815.

[301] *See* Freeman Tr. 846; Freeman Report ¶ 101.

[302] Am. Bylaws § 1.4(c)(1)(E). The Consulting/Nomination Provision requires the noticing stockholder to disclose, as to each nominee:

> (i) a complete and accurate description of all agreements, arrangements or understandings (whether written or oral, and including promises) between or among each Holder and/or any Stockholder Associated Person (as such terms "Holder" and "Stockholder Associated Person" are defined in this Section 1.4), on the one hand, and any Stockholder Nominee, on the other hand, (x) to consult or advise on any investment or potential investment in a publicly listed company (including the Corporation), and/or (y) to nominate, submit, or otherwise recommend the Stockholder Nominee for appointment, election or re-election (or, for the avoidance of doubt, as a candidate for appointment, election or re-election) to any officer, executive officer or director role of any publicly listed company (including the Corporation), in each case, during the past ten (10) years; and (ii) a complete and accurate description of the outcome of any situations described pursuant to the foregoing clause (i).

same problem as the AAU Provision insofar as it includes SAPs. It also imposes ambiguous requirements across a lengthy term.

The defendants made no effort to justify this provision in relation to their stated objectives, except to argue that this court previously blessed advance notice bylaws requiring the disclosure of AAUs "towards the shared goal of the nomination."[303] The Consulting/Nomination Provision does not stop with the present nomination—or even AAUs about AIM. It implicates a decade of AAUs (including "advice" on "potential investments") involving *other* publicly traded companies as well. Would a notice need to reveal if the spouse of an associate of a nominee had an understanding with the nominating stockholder nine years ago that they would exchange investment tips and was told that Apple shares were a good buy, but the investment was not pursued?

Mitchell acknowledged that the importance of the information sought in the Consulting/Nomination Provision is "arguable" at best.[304] At worst, it is draconian

---

[303] Defs.' Post-trial Br. 41 (quoting *Jorgl*, 2022 WL 16543834, at *12); *id.* at 41 n.19 (mentioning the Consulting/Nomination Provision once); *see* Freeman Report ¶ 47 (noting that the defendants did not ask their expert to address the propriety of the Consulting/Nomination Provision and observing that the bylaw is "uncommon"); Mitchell Dep. 152 (testifying that he is not aware of similar provisions); Appelrouth Dep. 159 (same).

[304] Mitchell Dep. 150.

and would give the Board license to reject a notice based on a subjective interpretation of the provision's imprecise terms.[305]

### c.     The Known Supporter Provision

Section 1.4(c)(4) requires the nominator and nominees to list all known supporters (the "Known Supporter Provision").[306]  The defendants argue that this bylaw requires disclosure of known supporters in accordance with the Court of Chancery's decision in *CytoDyn*.[307]  But the provision goes farther than what the precedent supports.  In *CytoDyn*, Vice Chancellor Slights observed that a bylaw mandating the disclosure of known *financial* supporters elicited information that is "vitally important" to voting stockholders.[308]  By contrast, the Known Supporter Provision here seeks disclosure of any sort of support whatsoever, including that of other stockholders known by SAPs to support the nomination.

---

[305] Freeman Tr. 846 (opining that the Consulting/Nomination Provision is "egregious," "overbroad," and allows "subjective" interpretation).

[306] The provision requires that the nominator disclose, as to each nominee:

> the names (including, if known, the full legal names and any alias names used) and addresses of other stockholders (including beneficial owners) known by any Holder or Stockholder Associated Person to support such Stockholder Proposal or Stockholder Proposals (including, without limitation, any nominations), and to the extent known, the class or series and number of all shares of the Corporation's capital stock owned beneficially or of record by each such other stockholder or other beneficial owner.

Am. Bylaws § 1.4(c)(4).

[307] Defs.' Post-trial Br. 31 (citing *Rosenbaum v. CytoDyn, Inc.*, 2021 WL 4775140, at *19 (Del. Ch. Oct. 13, 2021)).

[308] *CytoDyn*, 2021 WL 4775140, at *19.

58

The limits of this provision are ambiguous—both in the terms of the types of support and supporters one must disclose.  For example, if Kellner had posted on social media that he was running a proxy contest and an AIM stockholder liked his post, would Kellner be required to mention it in his notice?  Or would Kellner need to disclose if his associate's mother (an SAP) learned that an AIM stockholder who attends her church offered prayers for the proxy contest to succeed?  The defendants presented no evidence to demonstrate that such information is reasonably linked to the objectives they identified.  And even if a stockholder attempted to comply, the Board could take a broad reading of the Known Supporter Provision and reject the nomination as noncompliant for reasons a stockholder could not realistically anticipate.

Had the Board crafted a bylaw mandating the disclosure of known supporters providing financial support or meaningful assistance in furtherance of a nomination, it might have taken a legitimate approach to ensuring adequate disclosure.[309]  Instead, it overreached.  As drafted, the Known Supporter Provision impedes the stockholder franchise while exceeding any reasonable approach to ensuring thorough disclosure.

---

[309] In fact, the AAU Provision requires the disclosure of AAUs concerning "funding or financing" arrangements related to the nominations.  Am. Bylaws § 1.4(c)(1)(D).

### d. The Ownership Provision

Section 1.4(c)(3)(B) requires a nominating stockholder to disclose, among many other things, a Holder's ownership in AIM stock (including beneficial, synthetic, derivative, and short positions) (the "Ownership Provision").[310]

---

[310] Am. Bylaws § 1.4(c)(3)(B). The Ownership Provision requires that a notice disclose, as to Holders:

> as of the date of the notice (which information, for the avoidance of doubt, shall be updated and supplemented pursuant to subclause (g) of this Section 1.4), (i) the class or series and number of shares of capital stock of the Corporation of each such class and series which are, directly or indirectly, held of record or owned beneficially by each Holder and any Stockholder Associated Person (provided that, for purposes of this Section 1.4, any such person or entity shall in all events be deemed to beneficially own any shares of stock of the Corporation as to which such person has a right to acquire beneficial ownership at any time in the future (whether such right is exercisable immediately or only after the passage of time or the fulfillment of a condition, or both)), (ii) any short position, profits interest, option, warrant, convertible security, stock appreciation right or similar rights with an exercise or conversion privilege or a settlement payment or mechanism at a price related to any class or series or shares of the Corporation or with a value derived in whole or in part from the value or any class or series of shares of the Corporation or with a value derived in whole or in part from the value of any class or series of shares of the Corporation, or any derivative or synthetic arrangement having the characteristics of a long position in any class or series of shares of the Corporation, or any contract, derivative, swap or other transaction or series of transactions designed to produce economic benefits and risks that correspond substantially to the ownership of any class or series of shares of the Corporation, including due to the fact that the value of such contract, derivative swap or other transaction or series of transactions is determined by reference to the price, value or volatility of any class or series of shares of the Corporation, whether or not such instrument, contract or right shall be subject to settlement in the underlying class or series of shares of the Corporation, through the delivery of cash or other property, or otherwise, and without regard to whether the Holder and any Stockholder Associated Person may have entered into transactions that hedge or mitigate the economic effect of such instrument, contract or right, or any other direct or indirect opportunity to profit or share in any profit derived from any

increase or decrease in the value of shares of the Corporation (any of the foregoing, a "Derivative Instrument") directly or indirectly owned or held, including beneficially, by each Holder or any Stockholder Associated Person, (iii) a description of any proxy, contract ,agreement, arrangement, understanding or relationship pursuant to which each Holder and/or any Stockholder Associated Person has any right to vote or has granted a right to vote any shares or stock or any other security of the Corporation, (iv) any agreement, arrangement, understanding, relationship or otherwise, including any repurchase or similar so-called "stock borrowing" agreement or arrangement, involving any Holder or any Stockholder Associated Person, on the one hand, and any person acting in concert therewith, on the other hand, directly or indirectly, the purpose or effect of which is to mitigate loss to, reduce the economic risk (of ownership or otherwise) of any class or series of the shares of the Corporation by, manage the risk of share price changes for, or increase or decrease the voting power of, such Holder or any Stockholder Associated Person with respect to any class or series of the shares or other securities of the Corporation, or which provides, directly or indirectly, the opportunity to profit or share in any profit derived from any decrease in the price or value of any class or series of the shares or other securities of the Corporation (any of the foregoing, a "Short Interest"), and any Short Interest held by each Holder or any Stockholder Associated Person within the last twelve (12) months in any class or series of the shares or other securities of the Corporation, (v) any rights to dividends or payments in lieu of dividends on the shares of the Corporation owned beneficially by each Holder or any Stockholder Associated Person that are separated or separable from the underlying shares of stock or other securities of the Corporation, (vi) any proportionate interest in shares of stock of any class or series or other underlying securities of the Corporation or Derivative Instruments held, directly or indirectly, by a general or limited partnership or limited liability company or other entity in which any Holder or any Stockholder Associated Person is a general partner or directly or indirectly beneficially owns an interest in the manager or managing member of a limited liability company or other entity, (vii) any performance-related fees (other than an asset-based fee) that each Holder or any Stockholder Associated Person is or may be entitled to based on any increase or decrease in the value of the stock or other securities of the Corporation or Derivative Instruments, if any, including without limitation, any such interests held by members of the immediate family as such Holder or any Stockholder Associated Person, (viii) any direct or indirect legal, economic, or financial interest (including Short Interest) of each Holder and each Stockholder Associated Person, if any, in the outcome of any (X) vote to be taken at any annual or special meeting of stockholders of the Corporation or (Y) any meeting of stockholders of any other entity

61

The requirements extend to SAPs, immediate family members, and persons acting in concert with a nominee.[311]

I cannot say whether the Ownership Provision would choke a horse.[312] But it has certainly flummoxed this judge. Mitchell testified that the bylaw was written in such a way that "no one would read it" and that if the directors had started reading it "line by line" during their March 2023 Board meeting, they "would still be in the meeting."[313] Though I have tried to read and understand it, the bylaw—with its 1,099 words and 13 subparts—is indecipherable.

> with respect to any matter that is related, directly or indirectly, to any nomination or business proposed by any Holder under these by-laws, (ix) any direct or indirect legal, economic or financial interest or any Derivative Instrument or Short Interests in any principal competitor of the Corporation held by each Holder or any Stockholder Associated Person, (x) any direct or indirect interest of each Holder or any Stockholder Associated Person in any contract with the Corporation, any Affiliate of the Corporation, or any principal competitor of the Corporation (including, in any such case, any employment agreement or consulting agreement); and (xi) any material pending or threatened action, suit or proceeding (whether civil, criminal, investigative, administrative or otherwise) in which any Holder or any Stockholder Associated Person is, or is reasonably likely to be made, a party or material participant involving the Corporation or any of its officers, directors or employees, or any Affiliate of the Corporation, or any officer, director or employee of such Affiliate (the information specified in this paragraph (c)(3)(B) of this Section 1.4 shall be referred to as the "Specified Information").

[311] Am. Bylaws § 1.4(c)(3)(B).

[312] *PS Fund 1, LLC v. Allergan, Inc.*, C.A. No. 10057-CB, at 35 (Del. Ch. Sept. 22, 2014) (TRANSCRIPT) (describing a bylaw that would require a stockholder to disclose two years of trading history and all associates in which the stockholder held a stake of more than 10 percent as a "horse-choker of a bylaw").

[313] Mitchell Dep. 161-63.

The Board apparently set out to add a bylaw requiring the disclosure of not only beneficial ownership but also synthetic and derivative ownership, short interests, and hedging arrangements.[314] Provisions to that end are "very common."[315] They appear to have proliferated as a means to close loopholes in Section 13(d) involving synthetic equity.[316]

A provision requiring a stockholder to disclose such information seems perfectly legitimate. The problem for AIM is that the Ownership Provision as drafted sprawls wildly beyond this purpose. As one example, it requires the disclosure of "legal, economic, or financial" interests "in any principal competitor" of AIM.[317] The term "principal competitor" is undefined, creating ambiguity.[318] As another example, it calls for disclosure of "[a]ny performance-related fees that each Stockholder Associated Person is entitled to, including interests held by family members."[319] The plain terms of this requirement call for the disclosure of

---

[314] *See* JX 635; Pittenger Tr. 730-31.

[315] Pittenger Tr. 730-31; *see* Rock Report ¶ 67.

[316] Although these provisions emerged as part of the second generation of advance notice bylaws, they also respond to recent changes to Schedule 13D's beneficial ownership reporting requirement. *See supra* note 236 (discussing second generation advance notice bylaws); Rock Report ¶ 25 n.14 (listing sources).

[317] Am. Bylaws § 1.4(c)(3)(B)(ix).

[318] *See generally Levitt Corp. v. Office Depot, Inc.*, 2008 WL 1724244 (Del. Ch. Apr. 14, 2008) (considering an ambiguous bylaw); *Sherwood v. Chan Tsz Ngon*, 2001 WL 6355209 (Del. Ch. Dec. 20, 2011) (same); *JANA Master Fund*, 954 A.2d 335 (same).

[319] Am. Bylaws § 1.4(c)(3)(B)(vii).

performance-related fees that any family members of SAPs may receive. Since SAPs include immediate family members, would a nominating stockholder be required to disclose the entitlement of her mother's second cousin to such fees? Or would she be required to track down and disclose her affiliate's father's regular investments in actively managed mutual funds or ETFs that are, in turn, invested in one of AIM's "principal competitors"? I cannot say for sure.

Any justifiable objectives that might be served by aspects of the Ownership Provision are buried under dozens of dense layers of text. The provision seems designed to preclude a proxy contest for no good reason; none were given. A stockholder could not fairly be expected to comply.

### e. The First Contact Provision

Section 1.4(c)(1)(H) of the Amended Bylaws requires disclosure of the dates of first contact among those involved in the nomination effort (the "First Contact Provision").[320] The defendants argue that this provision is not preclusive because one could "determine, from any number of sources . . . the dates (or at the very least, the approximate dates) they first had contact with their nominees regarding director

---

[320] *Id.* § 1.4(c)(1)(H) (requiring a notice to set out "the dates of first contact between any Holder and/or Stockholder Associated Person, on the one hand, and the Stockholder Nominee, on the other hand, with respect to (i) the Corporation and (ii) any proposed nomination or nominations of any person or persons (including, without limitation, any Stockholder Nominee) for election or re-election to the Board of Directors").

nominations or AIM."[321]  I agree.  With a few email or text message searches, a nominee should be able to discern when they first had these contacts.[322]

Kellner asserts that the provision is unusual, but that is not the test.  The First Contact Provision is tailored to provide "a logical and reasoned approach [to] advanc[e] a proper objective" unique to AIM.[323]  It relates to the Board's desire to elicit sufficient information for the Board to make a recommendation about the nominations and stockholders to cast informed votes.  The Board would have been focused on securing this knowledge after its experience with the 2022 proxy contest.  The First Contact Bylaw would help alert the Board and stockholders to similar maneuvering.

### f.  The Questionnaire Provisions

Sections 1.4(c)(1)(L) and 1.4(e) of the Amended Bylaws require nominees to complete a form of D&O questionnaire (the "Questionnaire Provisions").[324]  Such

---

[321] Defs.' Post-trial Br. 39.

[322] Unlike the problems with the use of the SAP term discussed above, the provision here calls for a more defined set of information that could be known or knowable with reasonable diligence.

[323] *Dollar Thrifty*, 14 A.3d at 598.

[324] Am. Bylaws § 1.4(c)(1)(L) (requiring the nominating stockholder to submit, for each nominee, "a completed and signed questionnaire, representation and agreement and any and all other information required by paragraph (e) of this Section 1.4"); *see id.* § 1.4(e) (requiring each nominee to "deliver in writing" "a written questionnaire in the form provided by the Secretary with respect to the background, qualifications, and independence of such Stockholder Nominee (which questionnaire shall be provided by the Secretary upon

provisions are fairly standard in second generation advance notice bylaws and have been for some time.[325] Appropriately so. "Requiring that nominees submit responses to a questionnaire" created by the company "furthers the information-gathering and disclosure functions of advance notice bylaws."[326]

There is nothing unreasonable about the Questionnaire Provisions on their faces. Kellner questions one aspect: the allowance of five business days for AIM to send the form of questionnaire to a stockholder, which he avers might allow the company time to make unfair revisions.[327] It would amount to hair splitting for me to conclude that five days is unreasonable, but a slightly shorter time period (say, three days) is not. If the directors had manipulative goals in mind, one would assume that they could readily achieve them in a shorter time period. Such matters are better addressed in considering whether the Board's enforcement of the Questionnaire Provisions was equitable.

*　　　*　　　*

Four of the challenged Amended Bylaw provisions (the AAU Provision, Competitor/Nominating Provision, Known Supporter Provision, and Ownership

---

written request of any stockholder of record identified by name within five (5) Business Days of such written request").

[325] *See* Rock Report ¶¶ 46-47, 61; Pittenger Tr. 729.

[326] *Lee Enters.*, 2022 WL 453607, at *18.

[327] Pl.'s Post-trial Br. 11-12.

Provision), as drafted, do not afford stockholders "a fair opportunity to nominate candidates."[328] Rather than further the identified purpose of obtaining transparency thorough disclosure, these provisions seem designed to thwart an approaching proxy contest, entrench the incumbents, and remove any possibility of a contested election. As a result, they run afoul of Delaware law.[329] The provisions are "of no force and effect."[330]

That does not mean that the Amended Bylaws are void in total, as Kellner would have me declare. In Kellner's view, I should take an "all or nothing" approach

---

[328] *Hubbard*, 1991 WL 3151, at *11.

[329] *See* 8 *Del. C.* § 109(b) ("The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees."); *Blasius*, 564 A.2d at 659 (recognizing that "[t]he shareholder franchise is the ideological underpinning upon which the legitimacy of directorial power rests"); *cf. Hubbard*, 1991 WL 3151 at *11 ("[A]n advance notice by-law will be validated where it operates as a reasonable limitation upon the shareholders' right to nominate candidates for director. More specifically, such a by-law must, on its face and in the particular circumstances, afford the shareholders a fair opportunity to nominate candidates.").

[330] *Hollinger Int'l Inc. v. Black*, 844 A.2d 1022, 1082 (Del. Ch. 2004), *aff'd*, 872 A.2d 559, 564, 567 (Del. 2005); *see Openwave Sys.*, 924 A.2d at 239; *In re Osteopathic Hospital Ass'n of Del.*, 191 A.2d 333, 336 (Del. Ch. 1963) ("It is accepted law that a by-law which is unreasonable, unlawful, or contrary to public polic[y] may be declared void though adopted by legitimate procedures."); *see also Frantz Mfg. Co. v. EAC Indus.*, 501 A.2d 401, 407 (Del. 1985) ("The bylaws of a corporation are presumed to be valid, and the courts will construe the bylaws in a manner consistent with the law rather than strike down the bylaws. A bylaw that is inconsistent with any statute or rule of common law, however, is void.").

to analyzing the validity of the Amended Bylaws as adopted.[331]  That blunt tactic would yield extreme and unnecessary relief, especially given that the Board identified a proper corporate interest that it sought to protect by adopting the Amended Bylaws.  Instead, I have undertaken a careful analysis of the specific provisions Kellner highlighted and found some aspects of the Amended Bylaws to be inequitable.[332]  The rest of the Amended Bylaws stand.

## C.    The Application Claim

Kellner contends that the Board cannot lawfully reject his notice because it satisfies AIM's advance notice bylaws and that—even if it did not—the Board's application of the bylaws was inequitable.  Analyzing the enforcement of an advance notice bylaw begins with a contractual analysis.  If circumstances require, the court will go on to assess whether there is a "basis in equity to excuse strict compliance" with the bylaws.[333]

---

[331] *See* Pl.'s Post-trial Br. 34.  This is unlike the situation highlighted in Kellner's brief where the court looked at "all of the circumstances" surrounding the adoption of defensive actions.  *Phillips*, 1987 WL 16285, at *7.  Of course, it may be appropriate to consider how bylaws work together in assessing whether they are reasonable.  But one bylaw straying too far does not mean other legitimate bylaws should be invalidated.

[332] *See Hollinger*, 844 A.3d at 1078 ("Delaware's public policy interest in vindicating the legitimate expectations stockholders have of their corporate fiduciaries requires its courts to act when statutory flexibility is exploited for inequitable ends."); *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 239 (Del. 1982) (explaining that the court must apply "careful judicial scrutiny" where "the right to vote for the election of successor directors has been effectively frustrated").

[333] *Sternlicht*, 2023 WL 3991642, at *14; *see also Schnell*, 285 A.2d at 439 (stating that equity will prohibit attempts to "utilize the corporate machinery" for the "purpose of

### 1. Whether the Notice Complied with the Bylaws

Corporate bylaws are "part of a binding broader contract among directors, officers and stockholders formed within the statutory framework of the Delaware General Corporation Law."[334] Delaware courts employ "principles of contract interpretation" when construing a corporation's bylaws.[335] In the context of advance notice bylaws, the court asks: "were the bylaws clear and ambiguous, did the stockholder's nomination comply with the bylaws, and did the company interfere with the plaintiff's attempt to comply."[336]

When analyzing the first two questions, unambiguous terms will be "given their commonly accepted meaning"[337] and "[a]ny ambiguity in an advance notice bylaw is resolved 'in favor of the stockholder's electoral rights.'"[338] The third question likewise draws upon contract law. Compliance with advance notice requirements is effectively a condition precedent to a company being obligated to

---

obstructing the legitimate efforts of dissident stockholders in the exercise of their right to undertake a proxy contest against management"); *Coster*, 300 A.3d at 667 (explaining that Delaware courts deploy the *Schnell* doctrine in "cases where the board acts within its legal power, but is motivated for selfish reasons to interfere with the stockholder franchise").

[334] *Hill Int'l, Inc. v. Opportunity P'rs L.P.*, 119 A.3d 30, 38 (Del. 2015).

[335] *Brown v. Matterport, Inc.*, 2022 WL 89568, at *3 (Del. Ch. Jan. 10, 2022), *aff'd*, 2022 WL 2960331 (Del. Ch. July 27, 2022) (ORDER).

[336] *Lee Enters.*, 2022 WL 453607, at *9; *see also Sternlicht*, 2023 WL 3991642, at *14.

[337] *Hill Int'l*, 119 A.3d at 38 (quoting *Airgas, Inc. v. Air Prods. & Chems., Inc.*, 8 A.3d 1182, 1188 (Del. 2010)).

[338] *Jorgl*, 2022 WL 16543834, at *10 (quoting *Saba Cap.*, 224 A.3d at 977).

act, such as by accepting a stockholder proposal.[339] "Delaware courts follow the principle that a party who wrongfully prevents a thing from being done cannot avail itself of the nonperformance it has occasioned."[340] Kellner bears the burden of showing that his notice fulfills the bylaws' requirements.[341]

### a. The AAU Provision

The bulk of the parties' briefing focuses on whether the Kellner Notice complied with the AAU Provision. As discussed above, Section 1.4(c)(1)(D) of the Amended Bylaws is invalid because aspects of it are inequitable.[342] Its prior iteration in the 2016 Bylaws (the "2016 AAU Provision") does not suffer from the same flaws as the amended version. The scope of the 2016 AAU Provision is fully within and narrower than the 2023 AAU Provision. Given the vital corporate considerations at risk if nominating stockholders conceal AAUs, it would risk further inequity to excuse the Kellner Notice from disclosing them when AIM had a validly enacted

---

[339] *See Lee Enters.*, 2022 WL 453607, at *13 n. 142.

[340] *W & G Seaford Assocs. v. E. Short Mkts.*, 714 F. Supp. 1336, 1341 (D. Del. 1989) (describing the "cardinal principle of contract law regarding conditions" (citing Restatement (Second) of Contracts § 245 (1981))).

[341] *See Totta v. CCSB Financial Corp.*, 2022 WL 1751741, at *12 (Del. Ch. May 31, 2022), *aff'd*, 302 A.2d 387 (Del. 2023); *Jorgl*, 2022 WL 16543834, at *13-14.

[342] *See supra* note 301 and accompanying text.

provision in place pre-amendment.[343]  Accordingly, I revert to assessing whether the Kellner Notice complied with the 2016 AAU Provision.

The 2016 AAU Provision requires a notice to describe "all arrangements or understandings between such stockholder and each proposed nominee and any other person or persons (including their names) pursuant to which the nomination(s) are to be made."[344]  "Arrangements" and "understandings" are not defined in the 2016 Bylaws.  When met with undefined contract terms, Delaware courts turn "to dictionaries for assistance in determining the plain meaning."[345]  "Arrangement" means "a measure taken or plan made in advance of some occurrence sometimes for a legal purpose; an agreement or settlement of details made in anticipation."[346]  "Understanding" means "an agreement, especially of an implied or tacit nature."[347]  These terms are unambiguous.

---

[343] *See Hollinger*, 844 A.3d at 1078 (holding that bylaws are improperly adopted when "they were adopted for an inequitable purpose" despite being statutorily sound and taking a provision-by-provision approach to reviewing them); *cf. Rainbow Mountain, Inc. v. Begeman*, 2017 WL 1097143, at *2 (Del. Ch. Mar. 23, 2017) (holding that without "any proof [a later set of bylaws] were ratified" the earlier and properly adopted set "remain[ed] the operative bylaws").

[344] 2016 Bylaws § 1.4(c).

[345] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006).

[346] *Arrangement*, Black's Law Dictionary (11th ed. 2019).

[347] *Understanding*, Black's Law Dictionary (11th ed. 2019).

In *Jorgl*, this court construed the meaning of the 2016 AAU Provision using the terms' commonly accepted meanings.[348]  The decision explained that the phrase "arrangement or understanding," as it relates to nominations, requires disclosure of "any advance plan, measure taken, or agreement—whether explicit, implicit, or tacit, with any person toward the shared goal of the nomination."[349]  A "quid pro quo" is not required, but mere discussions or sharing of information "is not alone sufficient" to form an "arrangement or understanding."[350]  Because "arrangements" and "understandings" include "agreements," the fact that the 2016 Bylaws do not expressly mention "agreements" does not diminish the bylaw's scope.[351]  It can be interpreted consistent with the discussion of AAUs in other corporate law contexts.[352]

---

[348] 2022 WL 16543834, at *11.

[349] *Id.* at *11-12.

[350] *Id.*

[351] *Jorgl*, 2022 WL 16543834, at *11-12 (noting that "an 'arrangement' can be shown by an 'agreement'") (citing Black's Law Dictionary (11th ed. 2019)).

[352] *E.g.*, *Totta*, 2022 WL 1751741, at *24-25 (discussing how "the general corporate law understanding that persons act in concert when they have an agreement, arrangement, or understanding regarding the voting or disposition of shares"); *Chesapeake Corp. v. Shore*, 771 A.2d 293, 353 (Del. Ch. 2000) (discussing that in the context of Section 203, the terms "agreement," "arrangement," or "understanding" "permit a fairly high degree of informality in the form in which the parties come together" but "presuppose[] a meeting of the minds").

Since the 2016 Bylaws lack a 24 month lookback, I consider only whether the Kellner Notice omits or misrepresents AAUs for the current effort.[353] The Kellner Notice states that before July 2023, "no decision was made [for any of Kellner, Deutsch, or Chioini] to work together to advance potential nominations or otherwise take any action with respect to the Company."[354] This statement is false.

Kellner, Chioini, and Deutsch testified that no AAU relating to the 2023 effort existed until July 11 when they flew together on Kellner's jet for a meeting at BakerHostetler's offices.[355] This day was perhaps the culmination of the group's labors. But an AAU can "take the form of a 'measure' or 'plan' before an event."[356] Well before July, Chioini, Kellner, and Deutsch took measures to prepare for nominations and a proxy contest.

The 2023 effort was—in many ways—a continuation of the 2022 attempt. As early as November 2022, Kellner requested a meeting with Tudor and the Jorgl team

---

[353] Were the 24-month lookback in place, this section of my analysis would have provided an extended discussion of the central role Tudor played in the 2022 nomination effort. Strikingly, the Kellner Notice does not disclose any AAU with Tudor. Because the AAU Provision exceeded equity's limits, the reader was spared additional pages in this already lengthy decision.

[354] Kellner Notice 11.

[355] Chioini Tr. 29; Kellner Tr. 229; Deutsch Tr. 188-89; JX 765; *see also* Pl.'s Post-trial Brief 51.

[356] *Jorgl*, 2022 WL 16543834, at *12.

to discuss "next steps."[357]   At the same time, Chioini expressed that he and Rice intended to pursue nominations in 2023.[358]   In December, Chioini spoke to Kellner and told his counsel that Kellner was "very interested in working with us to remove these guys" and "want[ed] to keep in touch."[359]

Kellner's update to his fraternity brothers shortly after he spoke to Chioini is particularly revealing.[360]   Kellner wrote that "[t]wo other investors [we]re joining [him] in a proxy battle."[361]   Although he could not recall at trial who the two other investors were, he had named Deutsch and Tudor in an earlier draft.[362]   About two weeks after sending the final update, Kellner told Deutsch that he was reaching out to his attorney and would loop Deutsch in to "get this ball rolling!!"[363]

The ball rolled—albeit slowly since AIM's annual meeting was 10 months away.   Still, in February, BakerHostetler began requesting information from Kellner's attorney about his AIM stock ownership in emails forwarded to both

---

[357] JX 467.

[358] JX 468; *see also* JX 498; JX 526.

[359] JX 541.

[360] JX 557; *see* Kellner Tr. 346.

[361] JX 557.

[362] *See supra* note 143 (discussing that the reference was not to Chioini and Rice because they are not investors).

[363] JX 570.

Kellner and Deutsch.[364] Various calls were scheduled between Kellner, Deutsch, Chioini, and counsel throughout the spring.[365] The group kept abreast of AIM's bylaw amendments.[366]

Kellner's May 19 text to Deutsch further reflects that the group's activities since late 2022 or early 2023 were coordinated actions directed toward a shared goal of nominating director candidates.[367] In the text, Kellner directed Deutsch to contact Chioini and learn his plan "regarding AIM."[368] Because the annual stockholder meeting approached and the stockholder nomination deadline was imminent, time was "becoming critical."[369] Kellner was ready to "mov[e] th[e] ball forward" once again with Deutsch and Chioini.[370] There is no evidence that any other potential nominees were considered for Kellner's nomination.

---

[364] JXs 605-06.

[365] JX 695; JX 713; JX 740; JX 746.

[366] JX 700.

[367] JX 740.

[368] *Id.*

[369] *Id.*

[370] *Id.*; Deutsch 199-200. Deutsch testified that Kellner's use of the idiom "get the ball rolling" could "mean many things." Deutsch Tr. 199-200. In common parlance, "get the ball rolling" means to "begin an activity or process." *Get/set/start the ball rolling*, Merriam-Webster, https://www.merriamwebster.com/dictionary/get%2Fset%2Fstart%20the%20ball%20rolling (last visited Dec. 21, 2023). Kellner had consulted his attorney and asked Deutsch to get in touch with Chioini to start working towards submitting a nomination. There was no other reason to reach out to Chioini except to advance his nomination in 2023. Chioini was not (and is not) an AIM stockholder.

75

Even if the exact time at which an AAU among Kellner, Deutsch, and Chioini arose could not be identified with precision, it preceded July 2023. It is possible that no formal decision was reached before then for Kellner, Deutsch, or Chioini to submit a slate to AIM. But there was undoubtedly a tacit understanding before that while multiple preparations were undertaken. The Kellner Notice therefore omitted and misrepresented meaningful AAUs.

b.    Other Bylaw Provisions

Beyond the non-disclosure of AAUs, AIM detailed numerous other purported flaws in the Kellner Notice.[371] They are of varying degrees of importance.[372] Because I have already found that the notice was deficient regarding the misstatements about AAUs for the 2023 nomination, I will highlight just two others.

First, the Kellner Notice violated the First Contact Provision. Kellner was required to disclose "the dates of first contact between a nominating stockholder and/or [any SAP], on the one hand, and the Stockholder Nominee, on the other hand" regarding AIM or the Board nominations.[373] The Kellner Notice does not include

---

[371] *See* JX 378.

[372] For example, AIM's rejection letter states that the Kellner Notice did not list the full name of Deutsch's family office or its address. JX 378 at 9. It also states that the Kellner Notice fails to provide information required by Schedule 14A because each nominee consented to "being named as a nominee in any proxy statement" rather than "being named in **proxy statements**." *Id.* at 11 (emphasis in original).

[373] Am. Bylaws § 1.4(c)(1)(H).

any date of first contact between Kellner and Deutsch about the present nomination.[374] Kellner attempts to justify this omission by asserting that "the Bylaw Amendments do not require an exact date."[375] Maybe so. He made no attempt, however, to provide an approximate date. Regarding Chioini, the Kellner Notice merely states that Kellner was first in contact with him about AIM or the nominations in "late 2022."[376] This is fuzzy. Kellner only needed to check his record to give specifics.

Second, the Kellner Notice does not comply with the requirement that questionnaires submitted by nominees be certified as accurate in accordance with Section 1.4(c)(5) of the Amended Bylaws.[377] The questionnaires required nominees to disclose any adverse recommendation from proxy advisory firms in connection with their service on other boards.[378] Kellner, Deutsch, and Chioini each had prior "withhold" recommendations that they neglected to disclose.[379]

---

[374] Kellner Notice 11 ("In and around early 2021, Mr. Deutsch, who had started investing in the Company in the prior year, shared with Mr. Kellner his views on the significant potential of the Company's lead candidate, Ampligen, for multiple indications. Thereafter, Mr. Kellner invested in the Company and the Reporting Persons continued to communicate from time to time with respect to their investments in the Company.").

[375] Pl.'s Post-trial Br. 60.

[376] Kellner Notice 11.

[377] *Id.* at 20.

[378] Kellner Notice 35, 79, and 123.

[379] *Id.* at 35, 79, and 123; JX 2; JX 6; JX 10; JX 13; JX 20; JX 34; JX 263; JXs 1013-14. When a plurality voting standard is used, proxy advisors issue a "for" or "withhold"

The three maintain that they were unaware of any withhold recommendations until this litigation and note that such recommendations are not publicly available.[380] One would expect that, with the assistance of sophisticated counsel, Kellner, Deutsch, and Chioini could have gathered the data needed to respond. In any event, their questionnaires could have explained that they were unaware of any adverse recommendations or that they lacked knowledge. Instead, they each affirmatively checked "no."[381] Those representations were untrue.

### 2. Whether the Rejection of the Kellner Notice Was Equitable

Kellner's notice contravened the clear and unambiguous requirements of AIM's bylaws. "The court's analysis does not necessarily end if a stockholder fails to comply with the plain terms of an advance notice bylaw."[382] "Delaware courts have reserved space for equity to address the inequitable application of even validly-enacted" provisions.[383] Where appropriate, the court will consider whether a board "utilize[d] the corporate machinery . . . [to] obstruct[] the legitimate efforts of

---

recommendation. If a board uses a plurality voting standard, a "withhold" recommendation is the adverse recommendation. *See* Harrington Tr. 403; Equels Tr. 567.

[380] *See* Chioini Tr. 40; Harrington Tr. 402; JX 960 at 8-12.

[381] Defs.' Post-trial Br. 55; Kellner Notice 35, 79, 123.

[382] *Lee Enters.*, 2022 WL 453607, at *9.

[383] *CytoDyn*, 2021 WL 4775140, at *15 (emphasis omitted).

dissident stockholders in the exercise of their rights to undertake a proxy contest against management."[384]

That inquiry is warranted here. I have already found that the Board unreasonably implemented certain bylaws that infringed upon the stockholder franchise after it anticipated a proxy contest. Further, Kellner insists that the Board's process in rejecting the Notice was unreasonable, inequitable, and manipulative.

The parties agree that the Board's decision to reject Kellner's notice is subject to enhanced scrutiny. As discussed above, the relevant standard is a "situationally specific" application of *Unocal*.[385] The Board must prove that it identified a threat "to an important corporate interest" and that its response was "reasonable in relation to the threat posed."[386]

### a. Reasonableness

The Board has proven that its actions served proper corporate objectives. Specifically, it sought to obtain full and fair disclosure so that it could adequately evaluate a nomination and that stockholders could cast informed votes.[387] The Board retained independent counsel to evaluate the Kellner Notice with these goals in

---

[384] *Schnell*, 285 A.2d at 439. If a board frustrated a stockholder's effort to comply with an advance notice bylaw, the stockholder's non-compliance would arguably be excused as a matter of contract law as well as equity. *See supra* notes 339-40 and accompanying text.

[385] *Coster*, 300 A.3d at 672; *see supra* notes 256-57.

[386] *Coster*, 300 A.3d at 672-73.

[387] *See, e.g.*, *Lee Enters.*, 2022 WL 453607, at *9; *Jorgl*, 2022 WL 16543834, at *14-16.

79

mind.[388]  Counsel provided a detailed analysis.[389]  The Board then considered that advice when reviewing the Notice.[390]

With the guidance of counsel and based on its experience in 2022, the Board concluded that the Kellner Notice failed to disclose AAUs.[391]  The Board viewed the Kellner Notice as obscuring the roles of Deutsch, Tudor, and others in the 2022 nomination effort.[392]  It also decided that the Kellner Notice was false and misleading with regard to the group's plans for the 2023 nomination effort.[393]  It was reasonable for the Board to conclude that the objective of preserving an informed stockholder vote was threatened.

---

[388] *See* Equels Tr. 544-52, 625-28; Mitchell Tr. 640-41; Bryan Tr. 660-61, 666-67; Appelrouth Tr. 694-95.

[389] JX 907.

[390] JX 911; *see Cirillo Fam. Tr. v. Moezinia*, 2018 WL 3388398, at \*12 (Del. Ch. July 11, 2018) ("Delaware law statutorily encourages directors to rely on . . . counsel[] to inform themselves and properly discharge their fiduciary duties." (citing 8 *Del. C.* § 141(e)); *Carlton Invs. v. TLC Beatrice Int'l Hldgs, Inc.*, 1997 WL 305829, at \*12 (Del. Ch. May 30, 1997).

[391] JX 911; *see also* Pittenger Tr. 741-45.

[392] Equels Tr. 543-77; Bryan Tr. 611-64; Pittenger Tr. 738-49; Appelrouth Tr. 693-95.  The Board had another reason to be concerned.  A fee shifting petition remains pending in the *Jorgl* action, BakerHostetler's fees from the 2022 litigation are unpaid, and the Kellner Notice expressly stated that if successful, the group would seek repayment of fees from 2022.  The Board considered the intended reimbursement and determined that payment of $2 million for Chioini and Xirinachs' 2022 expenses would harm AIM.  *See* JX 911; Equels Tr. 554; Pittenger Tr. 749; Appelrouth Tr. 691-92.

[393] Equels Tr. 556-57; Bryan Tr. 662-63; Pittenger Tr. 742-45.

b.    Proportionality

The Board has also proven that rejecting the Kellner Notice was a proportionate means to promote the Board's objectives. "[T]he context in which the Board received" the Kellner Notice "cannot be ignored."[394] The Kellner Notice followed a proxy contest where Jorgl became an AIM stockholder solely to front a nomination and shield undisclosed persons behind the scenes. Those persons included two white collar criminals—one of whom had become increasingly hostile to AIM and had misrepresented himself as an AIM representative to third parties. It would have been obvious to the Board that the new nomination behind Kellner carried over from the prior year. Chioini was a constant, Deutsch remained involved (now as a nominee), and BakerHostetler continued to advise the effort. The threat to return "guns blazing" in 2023 came to fruition.[395]

The rejection was not, as Kellner argues, preordained. Kellner cites to a filing in the Florida litigation and a draft press release as evidence that the Board prejudged the Kellner Notice.[396] The weight of the record shows otherwise.[397] With regard to the filing, AIM told the Florida court that the Kellner Notice violated federal

---

[394] *Jorgl*, 2022 WL 16543834, at *16.

[395] JX 825; JX 526.

[396] *See* Pl.'s Post-trial Br. 69-70; Pl.'s Pre-trial Br. 46-47.

[397] *See supra* notes 388-93 and accompanying text.

81

securities laws one business day after the notice was submitted.[398] But Equels credibly testified that the filing was to rebut Kellner and Deutsch's representation to the Florida court that a "[Schedule] 13D issue" had become "moot."[399] As to the press release, it was prepared by an outside public relations advisor, was "contingent," and (of the Board members) only shared with Equels.[400]

Further, the Board's actions were not manipulative. The Board did nothing to prevent Kellner from complying with the valid provisions of AIM's advance notice bylaws.[401] Kellner seems to believe that AIM's advance notice requirements are problematic because stockholders are required to comply with them while incumbent directors are not.[402] But that is how advance notice bylaws work.

This is both non-controversial and logical. Incumbent directors are subject to fiduciary duties and certain securities law disclosure requirements that do not apply to nominating stockholders.[403] Additionally, the company already has access to information about incumbent directors that it can disclose to stockholders. Advance

---

[398] JX 878 at 9.

[399] Equels Tr. 601; *id.* at 595. This testimony is not inconsistent with the filing.

[400] Equels Tr. 626-67; *see* JX 1140; JX 1142.

[401] *See Lee Enters.*, 2022 WL 453607, at *17.

[402] *See* Pl.'s Post-trial Br. 72; Am. Bylaws §§ 1.4(a)(1), (a)(2), (c).

[403] *See generally* Equels Tr. 547, 557-58; Pittenger Tr. 731; Bryan Tr. 671-72; *see also* Rock Report ¶ 42 (noting that "the proxy rules do not require any evidence that the nominating stockholder has complied" with SEC Rule 14a-19).

notice bylaws elicit information about nominating stockholders and their nominees so that the Board and stockholders can become informed.[404]

Kellner also avers that the Board's revision of the D&O questionnaire during the five days between his request and receipt of the form amounts to manipulation.[405] The form was made 14 pages longer through two rounds of edits during that five-day period.[406] Although undertaking revisions after the form was requested is suboptimal, there is no evidence of bad faith.[407] The 2016 Bylaws lacked a provision requiring nominees to complete questionnaires. The addition of the D&O Questionnaire Provision necessitated a change to the Company's form so that it also applied to nominees.[408] After the form was revised, AIM's incumbent directors likewise completed it.[409]

Moreover, amending the questionnaire did not amount to the sort of material changes indicative of manipulation targeting stockholder rights.[410] The revisions to

---

[404] *See Saba Cap.*, 224 A.3d at 980.

[405] *See* JX 834; JX 841; *see also* JX 821 at 2.

[406] JX 834; JX 841.

[407] *See* Pittenger Tr. 734 (testifying that he meant to update the form before the window closed and the delay was inadvertent).

[408] Pittenger Tr. 732-35.

[409] *Compare* JXs 941-43, *and* JX 1131 *with* JX 875; *see also* JX 821 at 1.

[410] *E.g.*, *Hubbard*, 1991 WL 3151, at *11-13 (holding that post-deadline actions that "result[ed] in potentially significant changes in the corporation's management personnel and operational changes in its business policy and direction" and "generat[ed] controversy and shareholder opposition" were inequitable); *Lerman v. Diagnostic Data, Inc.*, 421 A.2d

the questionnaire are non-preclusive. The updated form is longer than the previous questionnaire originally designated for directors. It includes an additional section for stockholder nominees.[411] But it mostly consists of yes or no questions. Kellner was able to answer a majority of the sections that required narrative explanations with internal references to other parts of the completed notice.[412]

*          *          *

Ultimately, the nondisclosure of certain AAUs is fatal to Kellner's nomination effort. After the *Jorgl* litigation, Kellner, Chioini, Deutsch and their counsel should have been closely attuned to the importance of completely disclosing all relevant arrangements and understandings. Still, they flouted the Company's advance notice requirements. Because of the timing of Kellner's submission—the night before the submission deadline—there was no possibility of correcting any deficiencies.[413]

The concealment of arrangements and understandings that go to the heart of a nomination effort risks undermining the essential disclosure function of advance

---

906, 912-14 (Del. Ch. 1980) (concluding that a board lacked a justification for setting a meeting date that made it impossible for a stockholder to timely give notice of an intention to nominate); *see also Schnell*, 285 A.2d at 439.

[411] Kellner Notice 150.

[412] *Id.* at 33-162.

[413] JX 911 at 3; *see CytoDyn*, 2021 WL 4775140, at *2 ("Where Plaintiffs ultimately went wrong here is by playing fast and loose in their responses to key inquiries embedded in the advance notice bylaw, and then submitting their Nomination Notice on the eve of the deadline, leaving no time to fix the deficient disclosures when the incumbent Board exposed the problem.").

84

notice bylaws. Directors and stockholders would justifiably want to know whether a nomination is part of a broader scheme. Such information was withheld from or obfuscated in the Kellner Notice.

In these circumstances, the Board acted reasonably and equitably in rejecting the Kellner Notice. It did not breach its fiduciary duties in enforcing valid advance notice bylaws. The plaintiff's group—not the Board—are "the ones engaging in manipulative conduct."[414]

## III. CONCLUSION

Regarding Kellner's claim concerning the validity of the Amended Bylaws and AIM's counterclaim, judgment is entered for Kellner in part and for AIM in part. Regarding Kellner's claim concerning his compliance with the Amended Bylaws and the Board's rejection of the Kellner Notice, judgment is entered in favor of the defendants. Counsel for the parties shall confer on a form of order to implement this decision as soon as practicable, and no later than five days.

---

[414] *Jorgl*, 2022 WL 16543834, at *17.

85